# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**MARY SPEARS**
Gilroy Kammen Maryan & Moudy
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**MONIKA PREKOPA TALBOT**
Deputy Attorney General
Indianapolis, Indiana

**FILED**
Oct 19 2012, 9:24 am

*[signature]*

**CLERK**
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ALTON NEVILLE, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A05-1201-CR-9 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Grant W. Hawkins, Judge
Cause No. 49G05-1106-MR-42759

**October 19, 2012**

**OPINION - FOR PUBLICATION**

**CRONE, Judge**

**Case Summary**

Alton Neville appeals his convictions and sentences for murder and carrying a handgun without a license. On appeal, Neville argues that fundamental error requiring reversal of his convictions occurred due to prosecutorial misconduct (1) during voir dire when the prosecutor commented on the possibility of a false conviction, and during closing argument when the prosecutor (2) vouched for the witnesses; (3) mischaracterized the evidence; (4) argued inconsistent facts; (5) presented facts not in evidence; and (6) inflamed the passions and prejudices of the jury. He also asserts that fundamental error occurred due to the improper admission of certain evidence. Finally, he contends that his fifty-five year aggregate sentence is inappropriate.

We conclude that the prosecutor improperly presented facts not in evidence and improperly inflamed the passions and prejudices of the jury, but that the improper comments did not rise to the level of fundamental error. We further conclude that certain evidence was improperly admitted but did not result in fundamental error. Finally, we conclude that Neville has failed to carry his burden of persuading us that his sentence is inappropriate. Accordingly, we affirm.

**Facts and Procedural History**

On March 23, 2011, Dawn Lane and Linda Wilburn lived together in a house on West 31st Street in Indianapolis. An alley lies north of West 31st Street at the back of the house. Many people used the alley. Lane and Wilburn were both familiar with Neville, as they saw him in the neighborhood nearly every day. That afternoon, Wilburn was sitting on the front

2

porch of the house, and she saw Neville walking westbound in front of the house. She saw the handle of a gun in his waistband. Tr. at 193, 220. She spoke to him, but he did not hear her. Shortly thereafter, she saw him across the street walking eastbound. She spoke to him, and he nodded his head at her.

In the late afternoon, Lane was "getting high and drinking" and walking around her neighborhood. *Id*. at 139. She was near the New Dew barbershop when she saw Neville in his red truck. The New Dew barbershop is on Clifton Street, which runs perpendicular to West 31st Street. Specifically, the New Dew is located at the east end of the alley, just north of and around the corner from Lane and Wilburn's house. Neville asked Lane if she was going to the New Dew and if Jamal Hood was in there to "tell him to come out and meet him in the alley." *Id*. at 141. Lane went into the New Dew, saw Hood, and told him that Neville wanted to meet him in the alley. She saw Hood go to Neville's red truck and get in the passenger side.

Lane walked home and sat on the front porch with Wilburn. About five to ten minutes after Lane saw Hood get into Neville's truck, Lane and Wilburn heard gunshots. Lane went to the side of her porch and looked in the alley. She saw Neville standing outside the truck. She saw Hood fall to the ground and remain there. *Id*. at 145, 160. Lane testified that she saw Neville get in his truck and drive *westbound* down the alley. *Id*. at 145. Wilburn ran to the back of the house, and from the laundry room window, she testified that she saw a body on the ground and a truck speeding *eastbound* down the alley. *Id*. at 200.

Other people in the neighborhood heard the gunshots, too. Tamara Williams, Lane's niece, who also lived on West 31st Street, "heard what sounded like firecrackers." *Id*. at 167. Hood's aunt and uncle, Deborah and Kenneth Hood, lived on West Congress Avenue, the next road north of and parallel to West 31st Street. The back of their house was on the alley opposite the back of Lane and Wilburn's house. Deborah and Kenneth heard approximately five gunshots. Deborah ran to the door on the east side of her home and looked back toward the alley. She testified that she saw Neville speed eastbound and turn north onto Clifton Street. From Clifton, he turned west onto Congress and stopped two houses west of Deborah and Kenneth's house. Deborah saw Neville get out of the truck and enter that house.

Deborah, Kenneth, Lane, Wilburn, and Williams all ran to the alley and saw Hood lying on the ground behind the house immediately west of Lane and Wilburn's house. Indianapolis Metropolitan Police Officer Jason Norman was patrolling in the area when he was dispatched to a disturbance at 3500 Clifton Avenue. As he neared the location, he was flagged down by Lane, who told him that someone was shot in the alley. Officer Norman pulled into the alley and discovered Hood's body. He contacted the paramedics and the homicide unit. The paramedics arrived and pronounced Hood dead. The homicide detective, Tom Tudor, arrived a little after 5:00 p.m. and began his investigation.

At trial, Wilburn testified that later that evening, Neville called her cell phone and hung up. Wilburn called him back, but there was no answer. Wilburn had another cell phone

4

number for Neville, so she tried that one, and Neville answered.[1]  Wilburn testified to the

content of their conversation as follows:

> I asked him why was he calling.  I said, you know they looking for you.  You
> killed that little boy, why?  He said, he knew it, he said to do him a favor and
> say he was with me.  And I told him I didn't want to have no part of that, and
> I'm not going to say that.  And don't call me no more and I hung up the phone.

*Id*. at 208.[2]

Detective Tudor interviewed Lane on April 7, 2011.  At trial, she testified that the

statement she gave at that time was "something that was less than the truth," because she did

not want be involved.  *Id*. at 148.  Approximately three weeks later, Lane contacted the police

and this time she told Detective Tudor what she actually saw.  Lane identified Neville in two

different photographic lineups as the person she saw standing in the alley when Hood was

shot.  Wilburn also identified Neville in a photographic lineup.

---

[1]  The record before us reveals a different sequence of phone calls.  The phone records show that Wilburn called each of Neville's cell phones once between 6:56 and 6:57 p.m., that Neville called her at 7:00 p.m., and that she called him back at 7:01 p.m., at which time they had a two-minute conversation.  State's Exs. 49-A (Neville's cell phone records for 317-XXX-1999), 52-A, (Wilburn's cell phone records), 53-B Neville's cell phone records for 317-XXX-1272).

[2]  The prosecutor then asked Wilburn what Neville said about the shooting, and she answered, "He said *he knew he did it*."  Tr. at 208 (emphasis added).  However, on cross-examination, Neville's counsel referred Wilburn to the transcript of the statement that she had previously given to Detective Tudor and asked her whether she had said that Neville said he did it.  *Id*. at 213.  She answered, "He didn't say that. … he said, I know. *He didn't say, I did, he said, I know*.  I said, you know the police looking for you, you shouldn't have killed that boy.  And he said, I know, just say I was with you."  *Id*. at 213-14 (emphasis added).  Wilburn then confirmed that the transcript of her statement to Detective Tudor did *not* show that Neville said, "I know."  *Id*. at 214.  She read from the transcript:  "He asked me−he said,−he told me, he need a favor from me.  And he had asked me−no he said, Linda I need you.  I need you, and if anybody ask you anything just say I was with you.  And I said, no man."  *Id*. at 214.  She testified that "he [Detective Tudor] don't have all that what I said to him in here," and that the transcript "was not a true and complete transcript of what she had told the detective."  *Id*. at 214-15.

A forensic pathologist found six gunshot wounds in Hood's body from .38 caliber bullets that had been fired from the same firearm. No spent shell casings were found at the scene and no gun was ever recovered. The investigation revealed that Neville's cell phone records show that he was in the area of the murder at the time it was committed. State's Ex. 51-A.

The State charged Neville with murder and class A misdemeanor carrying a handgun without a license. On June 17, 2011, Neville was arrested. Detective Tudor conducted an interview of Neville, which was recorded. A jury trial was held on December 5 through 7, 2011. The jury found Neville guilty as charged. The trial court sentenced him to fifty-five years for his murder conviction and one year for his carrying a handgun conviction, to be served concurrently. Neville appeals. Additional facts will be provided as necessary.

**Discussion and Decision**

*I. Prosecutorial Misconduct*

Neville argues that the prosecutor made multiple statements that constitute misconduct. Generally, in order to properly preserve a claim of prosecutorial misconduct for appeal, a defendant must not only raise a contemporaneous objection but must also request an admonishment; if the admonishment is not given or is insufficient to cure the error, then the defendant must request a mistrial. *Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006). Neville concedes that he did not object to the prosecutor's comments and therefore did not properly preserve his claims.

To prevail on a claim of prosecutorial misconduct that has been procedurally defaulted, the defendant must establish not only the grounds for the prosecutorial misconduct, but also the additional grounds for fundamental error. *Id.* In reviewing a claim of prosecutorial misconduct, we "determine (1) whether the prosecutor engaged in misconduct, and if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected." *Booher v. State*, 773 N.E.2d 814, 817 (Ind. 2002) (citation and quotation marks omitted). "Whether a prosecutor's argument constitutes misconduct is measured by reference to case law and the Rules of Professional Conduct." *Cooper*, 854 N.E.2d at 835. "The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct." *Id.*

Fundamental error is an "extremely narrow exception" to the contemporaneous objection rule that allows a defendant to avoid waiver of an issue. *Id.* For a claim of prosecutorial misconduct to rise to the level of fundamental error, it must "make a fair trial impossible or constitute clearly blatant violations of basic and elementary principles of due process and present an undeniable and substantial potential for harm." *Booher*, 773 N.E.2d at 817 (citation, quotation marks, and brackets omitted). "The element of harm is not shown by the fact that a defendant was ultimately convicted." *Davis v. State*, 835 N.E.2d 1102, 1107 (Ind. Ct. App. 2005), *trans. denied* (2006). "Rather, it depends upon whether the defendant's right to a fair trial was detrimentally affected by the denial of procedural

7

opportunities for the ascertainment of truth to which he would have been entitled." *Id.* at 1107-08.

Specifically, Neville argues that the prosecutor engaged in misconduct (1) during voir dire by commenting on the possibility of a false conviction, and during closing argument by (2) vouching for the witnesses; (3) mischaracterizing the evidence; (4) arguing inconsistent facts; (5) presenting facts not in evidence; and (6) inflaming the passions and prejudices of the jury. We first address the prosecutor's comment during voir dire. We then address the prosecutor's comments during closing argument, separately addressing the impropriety of each comment and then considering as a whole whether any impropriety resulted in the denial of a fair trial.

### A. Voir Dire

During voir dire, defense counsel asked a prospective juror whether a person could be wrongfully accused of crimes and why it is important for the State to prove guilt beyond a reasonable doubt. Tr. at 79. Afterward, the prosecutor discussed the possibility of false conviction with the jury:

> The point is just because you're careful and what we want you to be as a fair jury is be careful evaluate the evidence. And just because some other jury someplace got it wrong doesn't mean you're going to get it wrong here today. Does that make sense? Now–you don't know. There are people wrongly convicted. Maybe they don't have a Judge as experienced and good as this Judge to make sure the jury has the right instructions. Maybe they had some kid just out of law school. And I assure you folks coming right out of law school you don't know how to practice law. You learn that over time. So maybe they didn't have a judicial officer like we have here. Maybe they had somebody that didn't know how to try a case versus [Neville's defense counsel] who has been a very skilled lawyer for many years. Maybe just some reason, some jurors were holding things back which caused an interference.

8

Did you see–there could have been a lot of issues why something went wrong. Doesn't mean it's going to happen here today, does it? Does that make sense?

*Id*. at 101-02.

Neville argues that the prosecutor's statement was an attempt to induce the jury to discount the possibility of a wrongful conviction. Indiana courts have condemned prosecutorial remarks that minimize the seriousness of the jury's responsibility. *See Kelley v. State*, 210 Ind. 380, 401-02, 3 N.E.2d 65, 74-75 (1936) (finding misconduct where prosecutor told jury that even if defendant were convicted he could appeal his case and would be out on bond during appeal and defendant could ask judge to suspend his sentence); *Hadley v. State*, 332 N.E.2d 269, 272 (Ind. Ct. App. 1975) (finding misconduct where prosecutor informed jury that even if they returned a guilty verdict, the trial judge might suspend the sentence or parole board might release defendant). We are troubled by the prosecutor's comments to the extent that they could be interpreted to suggest that, because the defendant has a good judge and a good attorney, the jury does not need to be concerned about a wrongful conviction.

The State argues that the prosecutor was responding to defense counsel's questioning about wrongful accusations. Prior to the prosecutor's comments, defense counsel asked one of the prospective jurors whether she thought that people could be wrongfully accused of crimes and why the State was required to prove guilt beyond a reasonable doubt. Tr. at 79. The juror answered that a person could be wrongfully accused and that if the State does not prove guilt beyond a reasonable doubt then the accused might not have committed the crime. Defense counsel then asked, "And that would be a pretty serious mistake, wouldn't it?" *Id*. at 80. Thus, it appears that the prosecutor was responding to defense counsel's line of

9

questioning. *See Cooper*, 854 N.E.2d at 836 ("Prosecutors are entitled to respond to allegations and inferences raised by the defense even if the prosecutor's response would otherwise be objectionable."). Further, the prosecutor prefaced the comment by saying that he wanted the jury to be fair, careful, and evaluate the evidence. It was not the only time that the prosecutor told the jury that he wanted a fair trial for Neville. *See* Tr. at 60 ("[W]e want a fair trial for this man too. He deserves a fair trial, we all do. We're all in that position and we all deserve a fair trial."). We do not mean to imply that a prosecuting attorney can avoid misconduct simply be telling the jury to be fair. Here, however, where the prosecutor was responding to the defense's line of questioning, we conclude that the prosecutor's comments did not rise to the level of fundamental error.

## B. *Vouching For Witnesses*

Neville contends that the prosecutor improperly vouched for the credibility of the State's witnesses during closing argument. He directs us to several comments. The prosecutor described Lane as "courageous," said that she "told you the truth," and said that she had been "especially corroborated." *Id*. at 470-71, 483. The prosecutor described Wilburn as one of the "good people every place in the city," and stated that "these [phone] records prove she told you the exact truth." *Id*. at 473. The prosecutor said that Margaret LeBlanc, the Marion County Forensic Services crime scene technician, was "very good at what she does" and "if there were [shell] casings there she would have found them." *Id*. at 482.

It is well settled that vouching for witnesses is generally impermissible. *Lainhart v. State*, 916 N.E.2d 924, 938 (Ind. Ct. App. 2009). However, "'a prosecutor may comment on the credibility of the witnesses as long as the assertions are based on reasons which arise from the evidence.'" *Cooper*, 854 N.E.2d at 836 (quoting *Lopez v. State*, 527 N.E.2d 1119, 1127 (Ind. 1988)). *See also Hobson v. State*, 675 N.E.2d 1090, 1095 (Ind. 1996) (prosecutor's statement "I warned you that [defendants] are liars" was not misconduct because incongruities in testimony supported inference that someone had not been testifying truthfully). In addition, an attorney may properly argue any logical or reasonable conclusions based on his or her own analysis of the evidence. *Bennett v. State*, 423 N.E.2d 588, 592 (Ind. 1981); *see also Turnbow v. State*, 637 N.E.2d 1329, 1334 (Ind. Ct. App. 1994) ("A prosecutor may also properly comment on the evidence presented to the jury and argue logical conclusions from that evidence.") *trans. denied*.

Our review of the record shows that the prosecutor's comments were supported by the evidence. He described Lane as "courageous" because although she was initially unwilling to get involved, she decided that the right thing to do was to come forward and reveal to Detective Tudor everything she saw. Tr. at 471. The prosecutor's statement that Lane told the truth was based on photographs of the house and alley, which confirmed that she could see the alley from her porch as she had testified. *Id*. The prosecutor's comment that Lane was "especially corroborated" was reasonably consistent with his analysis of the evidence and his theory of the case. The prosecutor's comment that Wilburn was one of the "good people every place in the city" was based on her refusal to provide Neville with an alibi. The

11

prosecutor's comments regarding LeBlanc are likewise reasonably based on the evidence that she had worked at the crime lab for four years and had collected evidence from approximately 200 homicide, rape, aggravated assault, and child molest cases. *Id*. at 264. We conclude that there was no improper vouching.

### C. Misrepresentation of Evidence

Neville asserts that the prosecutor misrepresented the evidence on three occasions. We observe that "[i]t is proper for a prosecutor to argue both law and fact during final argument and propound conclusions based upon his analysis of the evidence. That said, a prosecutor's comments can be prejudicial if they have an impact on the jury's ability to judge the evidence fairly." *Steinberg v. State*, 941 N.E.2d 515, 531 (Ind. Ct. App. 2011), *trans. denied* (citations, quotation marks, and brackets omitted). Prosecutors may not argue facts not in evidence. *Spangler v. State*, 498 N.E.2d 1206, 1209 (Ind. 1986).

First, Neville claims that the prosecutor misrepresented Lane's testimony. The prosecutor told the jury that Lane saw Neville's truck facing west because she saw Neville coming from the driver's side of the truck and "drop[] over on top of Jamal." *See* Tr. at 469 ("Because you think you're driving this way folks, the driver's side would be facing the south side of the alley"). Later, the prosecutor stated that Lane saw Neville's truck going eastbound to explain why no shell casings were found. *See id*. at 482 ("Ms. Lane said the truck that she saw is eastbound, he drives alongside and points out the window and fires," and "the defendant drove away with them [the casings].").

The State argues that the "witnesses themselves offered somewhat contradictory testimony," as Lane testified that the truck drove west, and Hood and Wilburn testified that the truck drove east. Appellee's Br. at 12. Given that there were witnesses who testified that the truck drove eastbound, we conclude that the prosecutor's failure to accurately identify the witness who saw the truck going eastbound is insignificant.

Second, Neville claims that the phone records did not corroborate Wilburn's description of the sequence of phone calls but that the prosecutor argued that they did anyway to bolster the truth of Wilburn's testimony. The prosecutor stated, "These records prove she told you the exact truth. His [Neville's] own phone records corroborate what she told you. And what she told you is, you know, you know you killed that boy. I know. Direct evidence folks." Tr. at 473-74. Neville argues that the phone records show that Wilburn tried to call him first, not the other way around. The State asserts that the phone records support Wilburn's testimony that it took several calls for her and Neville to be connected. Given that the phone records show that several phone calls between Wilburn and Neville were made before they finally had a conversation, we conclude that the prosecutor's statement was a reasonable commentary on the evidence.[3]

Third, Neville argues that the prosecutor misstated the evidence regarding his recorded interrogation by police. During the interrogation, the detective asked Neville if he had heard any "street talk" about what happened. State's Ex. 55-A. Neville answered, "I

_____

[3] We are unpersuaded by Neville's contention that the person who initiated the phone calls is significant. The prosecution did not emphasize that point, and of the three times that Wilburn testified that Neville called her first, two of them were on cross-examination when defense counsel questioned her about the phone calls. Tr. at 215-16.

heard all this happened because he must have robbed somebody or broke into somebody's house." *Id*. The detective asked him if he knew whether that happened for a fact. Neville said that he did not know.

In closing argument, the prosecutor commented on the interview as follows:

But you know what all this happened because I guess he must have robbed somebody or broke into somebody's house or something. Now I'll tell you, the word robbery is often misused. Robbery can mean a robbery, can mean a burglary, can mean a theft. How would he know if he didn't do it? Is this a Freudian slip? Is this insight into the actual motive. It may well be.

Tr. at 476-77. Neville argues that the prosecutor mischaracterized his statement by ignoring that he was answering a question from the detective about whether he had heard any "street talk" about what happened, and therefore his statement cannot be fairly interpreted "as a 'Freudian slip' offering any 'insight' into a motive for killing Mr. Hood." Appellant's Br. at 22.

Neville places too much emphasis on the fact that he was answering a question. Neville told the detective that he heard that Hood was shot because he robbed someone or broke into someone's house. Neville could have mistakenly revealed his motive by answering the question the way he did. In other words, the fact that he offered any reason for the murder could reflect his own reason for murdering Hood. We conclude that the evidence reasonably supports the prosecutor's suggestion that Neville's statement to the detective could have revealed his motive for murdering Hood.

14

### D. Inconsistent Facts

Neville contends that, in addition to misrepresenting Lane's testimony regarding the direction of the truck, the prosecutor argued that the truck faced *both* east and west in order to satisfy different evidentiary aspects of the case. According to Neville, the prosecutor argued that the truck was facing east in order to support Lane's testimony that she saw Neville standing over Hood's body. The prosecutor stated, "[Lane] sees the defendant come from that red truck out to the driver's side. Because you think you're driving this way folks [west], the driver's side would be facing the south side of the alley. He's coming from the driver's side." Tr. at 469. However, Neville claims that the prosecutor also argued that Neville was driving east and shot Hood from inside his car to explain why no spent shell casings were found at the murder scene:

> So how do you have a semi-automatic gun, but no casings are found. Not just some are missing, but all 6. They had to leave the scene, how did they leave the scene? He was firing from his truck. Jamal gets out of the truck, Ms. Lane witnessed that, and he's walking down the street. Jamal is walking away from the defendant, the defendant is driving eastbound as Ms. Lane said the truck that she saw is eastbound, he drives alongside and points out the window and fires. Those casings are coming back inside the cab of the truck. That's only a catch of 6 casings, the defendant drove away with them. …. The lack of physical evidence actually corroborates our witness [Lane].

*Id*. at 482.

In response, the State argues that Neville could have turned his truck around. In fact, the prosecutor made that argument:

> [Lane] sees a truck pointed westbound. She hears shots, she sees Jamal Hood stumble and fall. She goes back in her house. The other witnesses we have, the Hoods, [Wilburn] indicates [sic] the truck leaves down the east side of the alley. The same side of the alley that he knew he could get into. We don't

know what was down on the other side of the alley which would cause him to turn around, because he was turned around. He turned around in that truck, the pictures show you there is ample room to do so.

*Id*. at 494-95. We conclude that this was a reasonable inference or logical conclusion drawn from the admitted evidence, and therefore it was not improper.

### E.  Presentation of Facts Not in Evidence

In closing argument, the prosecutor described Neville's conduct immediately following the shooting as follows:

He's coming from the driver's side, he drops over on top of Jamal, I submit to you folks he looks at him and says, I did my job. Whatever this man had against him it's the motive, that stuck in the recesses of this man's mind. Why he formed the motive to form the intent to kill. He looks over at him, job well done, from his standpoint and walks back.

*Id*. at 469. Neville contends that this description was improper because it was not supported by the evidence. Prosecutors may not argue facts not in evidence. *Spangler*, 498 N.E.2d at 1209. The State concedes that there was no evidence that Neville stood over Hood gloating. We conclude that this comment was improper.

### F. Appeals to Passions and Prejudices of the Jury

During closing argument, the prosecutor stated,

Because this defendant was not going to give Jamal Hood what we're giving him. We're giving [Neville] a Judge, to judge evidence, he's got a very experienced defense counsel and most of all this defendant has you to judge his actions. But he didn't give that to Jamal. He just took him out. What agreed harm it is, he killed him for it. Think about it, all the rights the defendant has, which he is entitled to, and all those rights that he took away as well as the life of Jamal Hood.

….

But now is the point in this trial that you can find that for 3 days now you've been sitting 20 feet from a murderer. And–only thing about it, I can't do a thing about it. As [the other prosecuting attorney] told you in opening, voir dire, folks all I can do is put this man in this chair. All Detective Tudor can do is put this man in this chair, beyond that I am powerless. Only you have the power to get justice for the family who had to lose their son, their nephew.

….

That's my job, ask for justice, and only you can do it.

….

We're powerless–and now it's on you. Based on the lies you've heard from him [Neville], but mostly based on the evidence that we presented before you, convict him. Do it for Jamal.

Tr. at 477, 484, 485, 499.

Neville asserts that "[a]rguments based on principles of 'comparative justice,' exhortations to deliver a guilty verdict for the sake of the victim or for the sake of 'justice' and pleas for assistance to 'powerless' prosecutors [] have no place in the closing argument of the State." Appellant's App. at 13. We observe that "[i]t is misconduct for a prosecutor to request the jury to convict a defendant for any reason other than his guilt" or "to phrase final argument in a manner calculated to inflame the passions or prejudice of the jury." *Johnson v. State*, 453 N.E.2d 365, 369 (Ind. Ct. App. 1983). *See also Limp v. State*, 431 N.E.2d 784, 788 (Ind. 1982) (concluding that prosecutor's statements regarding the psychological damage done to the victim and whether she would ever recover "had no bearing on defendant's guilt or innocence" and were improper). Indiana Professional Conduct Rule 3.4(e) provides that

A lawyer shall not … in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as

17

a witness, or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused.

In support of his argument, Neville cites *Emerson v. State*, 952 N.E.2d 832, 838 (Ind. Ct. App. 2011), *trans. denied*, in which we concluded that the prosecutor's call for the jurors to "stand up to this bully" was improper. *See also Warner v. State*, 265 Ind. 262, 265-66, 354 N.E.2d 178, 181 (1976) (concluding that prosecutor's comment that "where law ends tyranny begins and for that reason I'm asking you to find this defendant guilty" was unnecessary, unprofessional, and improper). Neville also relies on *State v. Cockerham*, 365 S.E.2d 22 (S.C. 1988), in which the South Carolina Supreme Court reversed the defendant's conviction for murder and kidnapping due, in part, to the prosecutor's following comments:

> That night, February 9th, Dean Cockerham conducted a trial, much like the trial we are having here, in some ways, and in some ways, very far from it, because [the victim's] Constitutional Rights, and the rights to a trial by jury didn't do much for her that night, because on that night, he was her judge, he was her jury, and he was her executioner. And she didn't have the right to ... be represented by a lawyer. She didn't have the right to have independent people on her jury. Mr. Cockerham, loving Mr. Cockerham, took care of all that.

*Id*. at 23.

Here, the prosecutor's comments emphasizing that Neville received justice but deprived Hood of comparable justice and urging the jury to provide justice and find Neville guilty for the sake of Jamal and his family "have no bearing on the defendant's guilt or innocence." *Limp*, 431 N.E.2d at 788. Such comments stir up the sympathies of the jurors for the victim and have the potential to eclipse the jury's responsibility to base their decision

18

of guilt or innocence solely on the evidence presented. We conclude that the prosecutor's comments were improper.

***

We have concluded that two of the prosecutor's comments were improper: the comment describing Neville as gloating over Hood's body after the shooting and the comment appealing to the jury's passions and sympathies. However, these statements were not made in a vacuum. We must consider whether the misconduct, under all the circumstances, placed Neville in a position of grave peril to which he would not have been subjected. Additionally, Neville must show that the improprieties resulted in fundamental error. Based on vigorous cross-examination of the witnesses, defense counsel was able to analyze the evidence in his own closing argument as follows:

> And we have this wonderful witness, Diane Lane, who admits that she was high on crack that day, that makes her very reliable. She also gave two statements and one testimony, all three different. …. She's on crack, she tells 3 different stories and she got money when she testified. She said well I can't exactly say I saw him shoot Jamal. You know I thought it was pretty ingenious of [the prosecutor] to be able to figure out in his mind where those shell casings went. But he's shooting out the window, he's got his arm out the window, that's not going to put them back in. He'd have to be in the passenger seat to fire—for the bullet—shells to come back in to the right. Which is pure speculation anyway. You can't speculate somebody into a murder conviction. Then there is that stellar witness, Linda Shepherd Wilburn, she claims that [Neville] said, I know. They're saying that you shot that boy, and he said, yes I know. They're saying that you shot that boy, but when I asked her where in the transcript of her statement she said that, well it's there, it's there. She couldn't find it because it wasn't there. So somebody must have altered the transcription of her statement of course. You heard Detective Tudor say, no it's not altered. I've reviewed it, it's exactly the same as what she said. She didn't say that [Neville] said, yes I know. Nobody testified that they saw this shooting. I thought it was pretty ingenuous for [the prosecutor] to make no evidence into damning evidence. The fact of the matter is there is

19

no gun. There is no bullet or shells. There is no DNA, there is no fingerprints, there is no confession, there is no witness to the shooting. And there is no motive. What evidence did you hear that would point to any sort of motive. I submit to you, you didn't hear any, not a thing.

Tr. at 485-87. Neville's defense counsel forcefully countered the prosecutor's arguments. Thus, defense counsel's closing argument diminished any persuasive effect the prosecutor's comments might have had on the jury's decision if left unanswered. Moreover, the undisputed evidence is that Neville was in the alley when Hood was shot. The evidence shows that he was seen with a gun that day. Further, ten minutes before the shooting, Neville asked Lane to tell Hood to meet him in the alley, and Lane saw Hood get into his red truck. Although Neville told the detective that his red truck was not running the day of the murder, Neville's wife testified that of their three cars, it was the only one that was running that day and that he took her to work and picked her up in it. *Id*. at 387. We conclude that the prosecutor's comments during closing argument, under all the circumstances, did not have a probable persuasive effect on the jury that placed Neville in a position of grave peril. It follows that the prosecutor's improper comments, either singularly or collectively, were not so detrimental to the opportunities for the ascertainment of truth so as to make a fair trial impossible. Accordingly, no fundamental error resulted.

## II. *Admissibility of Evidence*

During Neville's recorded interrogation, Detective Tudor asked Neville, "Why would I have folk telling me that on the day of the homicide they see you in that red truck shoot Hood." State's Ex. 55-A. Neville said, "They said that they seen me shoot Hood?" *Id*. Detective answered, "Uh-huh." *Id*. Later, the detective told Neville, "Your name was the

20

only thing; it wasn't it coulda been this, it coulda been that. It was you." *Id*. At trial, Neville did not object to the admission of the detective's statements. On appeal, Neville asserts that the detective's statements lacked any basis in fact but the jury would have assumed that they were true, and therefore fundamental error occurred.

Neville cites *Smith v. State*, 721 N.E.2d 213 (Ind. 1999), to bolster his argument. There, the recorded police interview with the defendant included the police stating that "half of the people at the jail's [sic] called me wanting to tell me that you did it," and "Lamprey [the State's principal witness] said you did it because it was over Riggs [the victim] ripping you off your dope, your stash." *Id*. at 216 (brackets omitted). The defendant objected to the admission of the statements on hearsay grounds. However, the defendant did not request an admonishment that the statements were not to be used for the truth of the matter asserted, and none was given. Our supreme court concluded that because the police statements appeared to be assertions of fact, and not mere questions, and no admonishment was given, the admission of the statements was reversible error. *Id*.

Here, the statements appear to be statements of fact and would constitute inadmissible hearsay pursuant to *Smith*. Of course, this case differs from *Smith* in that Neville did not object to the statements and must establish fundamental error. As previously mentioned, Neville's counsel informed the jury in closing argument that Lane could not say that she saw Neville shoot Hood, that "[n]obody testified that they saw this shooting," and "there is no witness to the shooting." Tr. at 486-87. He also emphasized the unreliability of Lane's and Wilburn's testimony. Accordingly, we conclude that fundamental error did not occur.

21

### III. *Appropriateness of Sentence*

Neville contends that his fifty-five year aggregate sentence is inappropriate and asks us to reduce it to forty-five years. Article 7, Section 6 of the Indiana Constitution authorizes this Court to independently review and revise a sentence imposed by the trial court. *Smith v. State*, 839 N.E.2d 780, 787 (Ind. Ct. App. 2005). Indiana Appellate Rule 7(B) states, "The Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." "Although appellate review of sentences must give due consideration to the trial court's sentence because of the special expertise of the trial bench in making sentencing decisions, Appellate Rule 7(B) is an authorization to revise sentences when certain broad conditions are satisfied." *Purvis v. State*, 829 N.E.2d 572, 588 (Ind. Ct. App. 2005) (internal citation and quotation marks omitted), *trans. denied, cert. denied* (2006). The defendant bears the burden of persuading the appellate court that the sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

Here, Neville received the advisory sentence for murder. *See* Ind. Code § 35-50-2-3 ("A person who commits murder shall be imprisoned for a fixed term of between forty-five (45) and sixty-five (65) years, with the advisory sentence being fifty-five (55) years."). "The advisory sentence is meant to be the starting point for the court's consideration of what sentence is appropriate for the crime committed." *Smith*, 839 N.E.2d at 787. Neville does not argue that the nature of his crime warrants a sentence below the advisory. Rather, he argues solely that the advisory sentence is inappropriate based on his character. In support,

22

he directs our attention to the trial court's statement that it received twenty-eight letters showing that Neville has a "concerned and caring network available to him and that he's had a very positive effect on a great number of people." Sent. Tr. at 29-30.

Neville's argument ignores his criminal history. As a juvenile, Neville was found to be delinquent for forgery and battery resulting in bodily injury. As an adult, Neville was convicted of class B felony dealing in cocaine, and while on probation for that offense, he was arrested for class A misdemeanor domestic battery and battery resulting in bodily injury and his probation was revoked. The battery charges were ultimately dismissed pursuant to a plea agreement. Later, he was convicted for class A misdemeanor driving while suspended and class D felony possession of cocaine. At the time of his sentencing, there were two separate charges for driving while suspended pending against him. Balancing the letters on behalf of Neville against his criminal history, we cannot say that Neville's character warrants a sentence below the advisory. In light of the nature of the offense and Neville's character, we are unpersuaded that Neville's fifty-five year advisory sentence is inappropriate.

Affirmed.

RILEY, J., and BAILEY, J., concur.