## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 22 2016, 9:42 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Hilary Bowe Ricks
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Fred Baumgardner, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | March 22, 2016 <br><br> Court of Appeals Case No. <br> 49A02-1507-CR-917 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Annie Christ-Garcia, Judge <br><br> The Honorable Ronnie Huerta, Commissioner <br><br> Trial Court Cause No. <br> 49F24-1302-FD-12186 |

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Defendant, Fred Baumgardner (Baumgardner), appeals his conviction for sexual battery, a Class D felony, Ind. Code § 35-42-4-8(a)(1)(A) (2013), and battery, a Class B misdemeanor, I.C. § 35-42-2-1(a).

We affirm.

## ISSUE

Baumgardner raises one issue on appeal, which we restate as follows: Whether the State committed prosecutorial misconduct by improperly vouching for its own witness.

## FACTS AND PROCEDURAL HISTORY

On January 19, 2013, Baumgardner and his long-time friend and former sexual partner, D.G., met for dinner, watched a performance, and each consumed approximately four drinks and three shots of alcoholic beverages. At some point after midnight, they went to Baumgardner's residence, and D.G. asked Baumgardner if he could spend the night there because he did not want to risk driving intoxicated. They went downstairs to Baumgardner's room in the basement where they removed their pants and laid down on Baumgardner's bed. Baumgardner attempted to interest D.G. in sexual intercourse, but D.G. refused stating that he had a boyfriend. After kissing D.G.'s neck and lips, Baumgardner pulled D.G.'s underwear down and "grabbed [his] penis." (Transcript p. 16). D.G. continued to resist, but Baumgardner, while "holding

[D.G.] down" with one hand, "[spat] into his [other] hand[,] put it on his penis[,] and inserted it into [D.G.'s] anus." (Tr. pp. 17-18). Baumgardner kept repeating to D.G., "[W]hat your boyfriend doesn't know won't hurt him." (Tr. p. 18). D.G. finally "lost it"—he rolled off the bed, put his clothes on, and left. (Tr. p. 18).

[5] Two days later, on January 22, 2013, D.G. reported the incident to law enforcement and brought with him his blood-stained underwear. D.G. was interviewed by Indianapolis Metropolitan Police Department's (IMPD) Detective David Miller (Detective Miller), who sent him to Methodist Hospital for a sexual assault examination. After obtaining a search warrant for a buccal swab, Detective Miller went to Baumgardner's residence to interview Baumgardner and execute the warrant on January 28, 2013. Baumgardner first insisted that D.G. never entered his residence, but then stated that D.G. entered the residence to use the restroom. When Detective Miller asked him why he was lying, Baumgardner indicated that he would retain counsel. Detective Miller executed the warrant and transported Baumgardner's buccal swab to IMPD's property room. Baumgardner's DNA was later matched with the DNA material collected from D.G.'s underwear.

[6] On March 19, 2013, the State filed an Information charging Baumgardner with Count I, sexual battery, a Class D felony; and Count II, battery, a Class B misdemeanor. At a jury trial on May 12, 2015, the State called D.G., Detective Miller, and a DNA analyst of the Indianapolis-Marion County Forensic

Services Agency to testify.  Following the testimonies of the State's witnesses, the State made its closing argument:

> [State]:  So at the beginning of the trial [my colleague] told you that you would hear from [D.G.] and he would tell you about what happened to him that night um, the night of [January 19, 2013,] into the early morning hours of [January 20, 2013].  And what you heard was [D.G.] tell you the truth and you heard some corroborating evidence that went along with that.  You heard [Baumgardner's] statement through [Detective Miller] that they were friends, they'd known each other for a while.  They had engaged in intercourse before … [Baumgardner] actually said they only had sex one time and the victim, [D.G.], indicate[d] that they actually had um, sex more than that[;] so he was telling the truth about that.  He didn't hide the fact that he had sex with...
>
> [Defense]:  I'm going to object at this point to her testifying that someone was telling the truth.

(Tr. p. 94).

[7]  The trial court sustained the objection, and the State continued:

> [State]:  You also heard them say that they both agree that they were friends, that they'd known each other for quite a while and um, that there was no reason for anything going on and bad on (sic.) their relationship.  They um, hadn't talked to each other for a while and then they um, meet each other up to just catch up right, like friends do.  You text each other and then you see each other.  There was no conversation about sex uh, before or after when they were out drinking at the bar, there was no conversation about sex on the drive home.  [D.G.] told you[, "]I was too drunk to drive[,"] so they [went] home[;] he told you,

["H]onestly, I drunk a lot that night, okay maybe it was four beers maybe it...["]

[Defense]: Judge again the word honestly, truth all of those [the State] can't refer to those in closing argument.

[Court]: Okay, [the State] please refrain from um, those specific words.

(Tr. p. 95).

[8] Finally, when discussing the DNA evidence from D.G.'s underwear and its match to Baumgardner's DNA, the State again stated, "[D.G.] was honest, oh sorry, I will not use that word, he tried to tell you the truth about what would happen and you can believe that because he told you everything about their relationship." (Tr. p. 97). At the conclusion of the jury trial, Baumgardner was found guilty as charged. On June 30, 2015, the trial court sentenced Baumgardner to an aggregate term of 730 days of imprisonment suspended to probation.

[9] Baumgardner now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

[10] We first note that the State did not file an appellee's brief. The obligation of controverting arguments presented by the appellant properly remains with the State. *Bovie v. State,* 760 N.E.2d 1195, 1197 (Ind. Ct. App. 2002). When the appellee does not submit a brief, the appellant may prevail by making a *prima facie* case of error—an error at first sight or appearance. *Id.* However, we are

still obligated to correctly apply the law to the facts of the record to determine if reversal is required. *Id.*

[11] Baumgardner alleges that the prosecutor committed misconduct by improperly vouching for the State's witness. Specifically, in her closing argument, the prosecutor stated that Baumgardner and D.G. "had … sex more than [once] so [D.G.] was telling the truth about that." (Tr. p. 94). The prosecutor further stated to the jury, "[D.G.] told you[, ']I was too drunk to drive[,'] so they [went] home[;] he told you, ['H]onestly, I drunk a lot that night, okay maybe it was four beers maybe it…[']" (Tr. p. 95). Finally, the prosecutor stated, "[D.G.] was honest, oh sorry, I will not use that word, he tried to tell you the truth about what would happen and you can believe that because he told you everything about their relationship." (Tr. p. 97).

> In reviewing a claim of prosecutorial misconduct properly raised in the trial court, we determine (1) whether misconduct occurred, and if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected otherwise. A prosecutor has the duty to present a persuasive final argument and thus placing a defendant in grave peril, by itself, is not misconduct. Whether a prosecutor's argument constitutes misconduct is measured by reference to case law and the Rules of Professional Conduct. The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct. To preserve a claim of prosecutorial misconduct, the defendant must—at the time the alleged misconduct occurs—request an admonishment to the jury, and if further relief is desired, move for a mistrial.

*Ryan v. State,* 9 N.E.3d 663, 667 (Ind. 2014) (internal citations omitted), *reh'g denied*.

[12] We have previously held that it is inappropriate for a prosecutor to make an argument which takes the form of personally vouching for a witness. *Gaby v. State,* 949 N.E.2d 870, 880 (Ind. Ct. App. 2011). As set forth in the Rules of Professional Conduct:

> A lawyer shall not ... in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, *or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of the accused*[.]

Ind. Professional Conduct Rule 3.4(e) (emphasis added). However, a prosecutor may comment on the credibility of the witness if the assertions are based on reasons which arise from the evidence. *Gaby,* 949 N.E.2d at 881.

[13] Baumgardner asserts that the prosecutor's conduct in this case resembles the prosecutor's conduct in *Gaby* "to a tee." (Appellant's Br. p. 13). In *Gaby*, a child molestation case that was tried more than ten years after the alleged conduct, the State's case was based on the child's recollection of the events. *Id.* at 873. During closing argument, the prosecutor stated that she was "confident" that the jury would "come to the same conclusion" that she and the police detectives had come to. *Id.* at 881. The prosecutor continued, "I cannot and would not bring charges that I believe were false." *Id.* The prosecutor finally stated, "I can tell you that with a guilty verdict on this case I will be able

to sleep fine tonight. Just fine. In fact, better than fine. You will be able to also." *Id.* We found that the prosecutor's remarks constituted improper vouching for the child's credibility, which was the central issue in the case. *Id.* As such, we held that

> [a]lthough we recognize that the prosecutor's comments were in response to [the defendant's] argument that [the child's] accusations were false, the prosecutor's response still crosse[d] the line into improper vouching as her comments were not based solely on reasons which arose from the evidence, but rather, asserted a personal knowledge of the facts at issue.

*Id.*

[14] Nonetheless, we find Baumgardner's reliance on *Gaby* to be misplaced. Baumgardner argues that "D.G.'s credibility, or lack thereof, was really the only issue for the jury to decide." (Appellant's Br. p. 9). He acknowledges that the "uncorroborated testimony of a single witness," a testimony similar to the child's testimony in *Gaby*, could be deemed sufficient to sustain a conviction on appeal. (Appellant's Br. p. 17). Baumgardner continues, "Sufficient does not mean overwhelming, however; there were parts of D.G.'s testimony that seemed implausible, but the State diminished their affect [*sic*] by arguing that if [D.G.] was honest about some of it, he must be truthful about all of it." (Appellant's Br. p. 17). We disagree. While it is true that parts of D.G.'s testimony seemed implausible, his testimony was not the only evidence presented to the jury. Contrary to Baumgardner's argument and unlike the child's testimony in *Gaby*, D.G.'s testimony was corroborated by other

evidence, such as the physical DNA evidence and Detective Miller's testimony at trial.

[15] Further, our review of the record indicates that the prosecutor's comments during her closing argument were not unfounded attempts to bolster D.G.'s credibility, but were assertions and conclusions, albeit poorly worded, sufficiently supported by the evidence presented at the trial. Specifically, the prosecutor's remarks regarding Baumgardner and D.G.'s sexual relationship were supported by D.G.'s numerous admissions during the trial, the DNA material found in D.G's underwear that matched Baumgardner's DNA, and Detective Miller's testimony, who testified that Baumgardner informed him that "they were friends but that they had sex[;] it was on one other occasion … threesome with a, with [an] ex-boyfriend or boyfriend at the time." (Tr. p. 55). The prosecutor's statement when she said, "[D.G.] told you[, ']I was too drunk to drive[,'] so they [went] home[;] he told you, ['H]onestly, I drank a lot that night, okay so maybe it was four beers maybe it…[,']" was not even vouching because the prosecutor was quoting and paraphrasing D.G.'s statement, where the adverb "honestly" in the context of the whole statement served to indicate the speaker's attitude.

[16] In sum, although the objectionable words somewhat bolstered the credibility of the witness and the State should have refrained from using these specific words after two sustained objections, we find that the prosecutor's statements in their entirety were nonetheless supported by the evidence and the effect of the specific words on the jury's decision was minimal because the jury received

proper preliminary and final instructions. *See*, *e.g.*, *Neville v. State,* 976 N.E.2d 1252, 1263-65 (Ind. Ct. App. 2012) (the defendant was not placed in grave peril by prosecutor's statement because the trial court's preliminary and final jury instructions diminished any persuasive effect the prosecutor's comments might have had on the jury's decision if left unanswered), *trans. denied*; *Stephenson v. State,* 742 N.E.2d 463, 485 (Ind. 2001) ("Having found that any prosecutorial impropriety which may have occurred was *de minimus* or otherwise overcome by the trial court's admonishments and instructions, we are unable to conclude that Defendant was placed in grave peril."). Specifically, in its preliminary instructions, the trial court informed the jury that it must base its decision only on the evidence presented during the trial and the trial court's instructions on the law. In its Preliminary Instruction No. 15, the trial court tendered:

> When the evidence is completed, the State and the Defense will make final statements. These final statements are not evidence but are given to assist you in evaluating the evidence. Each side is also permitted to argue, to characterize the evidence and to attempt to persuade you to particular verdicts. You may accept or reject those arguments as you see fit.

(Appellant's App. p. 115).

[17] In its Final Instruction No. 8, the trial court also stated:

> The unsworn statements or comments of the Defense and the Prosecutor should not be considered as evidence in this case. It is your duty to determine the facts from the testimony and the evidence admitted by the [trial court] and given in your presence

and you should disregard any and all information that you may derive from any other source.

(Appellant's App. p. 132).

[18] Under these circumstances, we find that the jury instructions were sufficient to overcome any potential harm to Baumgardner from the prosecutor's use of the specific words. We further find that, when referring to D.G.'s credibility, the prosecutor did not base her comments on her personal opinion, but instead based it on the evidence presented at the trial. As such, we conclude that the prosecutor's comments did not place Baumgardner in a position of grave peril to which he would not have been subjected otherwise.

## CONCLUSION

[19] Based on the foregoing, we hold that there was no improper vouching.

[20] Affirmed.

[21] Najam, J. and May, J. concur