# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jan 27 2017, 8:38 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Ruth Johnson
Darren Bedwell
Marion County Public Defender
Appellate Division
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Curtis Foster, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | January 27, 2017 <br><br> Court of Appeals Case No. <br> 49A02-1603-CR-541 <br><br> Appeal from the <br> Marion Superior Court <br><br> The Honorable <br> Robert York, Judge Pro Tempore <br><br> Trial Court Cause No. <br> 49G06-1404-MR-18875 |

**Kirsch, Judge.**

[1] Following a jury trial, Curtis Foster ("Foster") was convicted of murder[1] and was sentenced to fifty-five years executed. He appeals, raising the following issue: whether the State committed fundamental error by engaging in prosecutorial misconduct during closing arguments.

[2] We affirm.

## Facts and Procedural History

[3] On April 9, 2014, Jerome Warren ("Warren") and his wife, Genean Hoskin ("Genean"), along with other family members, were in the front yard of their home on East 20th Street in Indianapolis, Indiana. Also present were Genean's son, Daniel Kelly ("Kelly"), her daughter, Shenean Kelly ("Shenean"), and Shenean's young children, and Warren's son, Jerome Warren, Jr. ("Junior"). Foster, who was known to the parties on the front yard because he lived in an apartment complex near Genean's sister, drove up to the end of the driveway in front of the house in a black Grand Am. Foster was in the driver's seat of the Grand Am, and he had a passenger in the car, who Kelly knew only as "Oodie." *Tr.* at 59.

[4] Kelly and Junior approached Foster's car and spoke with Foster for a few minutes. Warren, who did not like Foster, walked over to the car and told Foster to leave. When Foster did not leave, Warren and Foster exchanged

---

[1] *See* Ind. Code § 35-42-1-1(1).

some heated words, and Warren slapped Foster in the face. Foster then drove away.

[5] After this incident, Shenean decided to take her children into the house, and as she came back to the door of the house, she saw Foster returning in his car and screamed, "Mom, here he comes." *Id*. at 203. Foster pulled up in front of the house at the end of the driveway, and when he stopped, he pointed a handgun at Kelly and in the direction of the house. Foster tried to fire a shot, but the gun did not fire on the first attempt. Kelly was able to observe the gun and believed it to be a .40 caliber handgun. Foster then attempted to shoot the gun again, and this time, the gun fired. He fired at least four shots, one of which hit Warren.

[6] Kelly pulled out his own handgun, which was a 9 millimeter semiautomatic, and returned fire at Foster. Foster drove away as Kelly continued to fire at the car. Foster lost control of the car at a nearby intersection, crashing into a ditch. Foster and his passenger exited the car and fled in different directions. Andrew Lash ("Lash"), who lived nearby and was returning home at the time, saw Foster's car lose control and crash. Lash then observed Foster run past him carrying a handgun.

[7] The shot that hit Warren struck him in the head and passed through his skull, killing him almost instantly. The bullet was never located. Genean went to assist her husband, and two neighbors attempted to perform CPR on him. Genean called 911, but gave the phone to Shenean to complete the report to

dispatch. Police were dispatched to the residence at 4:23 p.m., and one Indianapolis Metropolitan Police Department ("IMPD") officer arrived at 4:25 p.m. The passenger from Foster's car was located nearby and detained. Foster was not arrested until July 17, 2014.

[8] The State charged Foster with murder, unlawful possession of a firearm by a serious violent felon as a Class B felony, and with a sentencing enhancement for using a firearm in an offense causing serious bodily injury or death. A jury trial was held, during which the defense argued that Kelly, not Foster, had shot Warren. Foster relied on three witnesses for this assertion, Anquinten Brown ("Brown"), Pamela Atkins ("Atkins"), and an investigator paralegal employed by defense counsel. Brown, a lifelong friend of Foster's, testified that Kelly had called him and asked him to "come and get [Foster]. [Foster] on some bullshit." *Tr.* at 385. Brown alleged that he went to the scene of the crime and saw Warren lying on the ground in front of the house and Genean in the yard, "with nobody kneeling down trying to do nothing." *Id.* at 398. Brown testified that Kelly was "trying to say that [Foster] shot his daddy." *Id.* at 387. Brown claimed that he stayed at the scene for about six to ten minutes until he heard the police approaching, and then he left. *Id.* at 426. Brown also alleged that Kelly asked him to meet later in the day and that Kelly said, "Either I shot [Warren] or [Foster] shot him." *Id.* at 390.

[9] Atkins testified that she had a child with Warren and had been in a relationship with him for many years at the time of his death. She also testified that she had a conversation with Kelly about a year after the shooting. Atkins stated that

Kelly approached her and stated, "I didn't kill him. I didn't kill him," referring to Warren. *Id.* at 432. Atkins responded, "The word on the street is that you shot him." *Id.* Although Dr. Joyce Carter, the Marion County Coroner's Chief Pathologist who presented Warren's autopsy findings at trial, had testified that Warren's head wound provided insufficient information to determine the trajectory of the bullet that killed him, an investigator paralegal from defense counsel's office testified to measurements he had made, including the height of the window in a vehicle like the one Foster was driving. Defense counsel later argued that, according to these measurements, it "would have been impossible for whoever was in that car" to have fired a shot with the trajectory that killed Warren. *Id.* at 474-75.

[10] During closing argument, the State made the following statements:

> But like we talked about in voir dire, the witnesses that come up here and tell you what happened, they get the presumption that they are telling you the truth and until they give you a reason to believe otherwise, you are to believe them. Now what did we hear? There were some inconsistencies. But, again, like we talked about in voir dire, people remember things differently.

*Id.* at 457. Foster did not object to these statements. The State argued that its witnesses were more credible based partly on corroboration by the physical evidence. The State also asserted that Foster's witnesses were less credible due to inconsistencies in their testimony. In addressing Brown's testimony, the State noted that Brown testified that he had been at the scene for six to ten minutes before the police showed up, but the IMPD records showed that an

officer responded two minutes after the 911 call. Further, while Brown stated that no one was attending to Warren's body, testimony from other witnesses established that Genean and two neighbor women were administering CPR. At the conclusion of the trial, the jury found Foster guilty on the murder charge, and the State moved to dismiss the remaining counts. The trial court sentenced Foster to fifty-five years executed. Foster now appeals.

## Discussion and Decision

[11] When reviewing an allegation of prosecutorial misconduct, we make two inquiries. First, we determine by reference to case law and rules of conduct whether the prosecutor engaged in misconduct, and if so, we next determine whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected otherwise. *Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014). The gravity of the peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct. *Id.*

[12] Generally, in order to properly preserve a claim of prosecutorial misconduct for appeal, a defendant must not only raise a contemporaneous objection but must also request an admonishment; if the admonishment is not given or is insufficient to cure the error, then the defendant must request a mistrial. *Neville v. State,* 976 N.E.2d 1252, 1258 (Ind. Ct. App. 2012), *trans. denied.* Here, Foster concedes that he did not object to the challenged statements made by the prosecutor during closing argument. Where a defendant does not raise a

contemporaneous objection, request an admonishment, or, where necessary, request a mistrial, the defendant does not properly preserve his claims of prosecutorial misconduct. *Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006).

[13] "To prevail on a claim of prosecutorial misconduct that has been procedurally defaulted, the defendant must establish not only the grounds for the prosecutorial misconduct, but also the additional grounds for fundamental error." *Neville,* 976 N.E.2d at 1258. Fundamental error is an "extremely narrow exception" to the contemporaneous objection rule that allows a defendant to avoid waiver of an issue. *Cooper*, 854 N.E.2d at 835. "For a claim of prosecutorial misconduct to rise to the level of fundamental error, it must 'make a fair trial impossible or constitute clearly blatant violations of basic and elementary principles of due process and present an undeniable and substantial potential for harm.'" *Neville*, 976 N.E.2d at 1258-59 (quoting *Booher v. State*, 773 N.E.2d 814, 817 (Ind. 2002)). The element of harm is not shown by the fact that a defendant was ultimately convicted. *Id.* Instead, it depends upon whether the defendant's right to a fair trial was detrimentally affected by the denial of procedural opportunities for the ascertainment of truth to which he would have been entitled. *Ryan*, 9 N.E.3d at 668 (quotation marks omitted).

[14] Foster argues that the prosecutor engaged in misconduct when she made certain statements during closing argument regarding the presumption that witnesses are telling the truth. He contends that the prosecutor's statements were a misstatement of the law, "invaded the province of the jury in determining witness credibility, and conflicted with [his] constitutional right to the

presumption of innocence." *Appellant's Br.* at 11. Foster alleges that it is inappropriate for counsel to misstate the law and that an erroneous statement of the law is misconduct. He further claims that the jury instructions given by the trial court did not cure the harm done by the prosecutor's misstatement of the law and that the prosecutor's statements constituted impermissible vouching. Foster asserts that the prosecution's case depended on the jury believing the State's witnesses and that the misstatement of the law, telling the jury had a legal duty to believe every witness was telling the truth, violated his presumption of innocence and right to a fair trial.

[15]    Foster specifically asserts that the prosecutor committed misconduct by making the following comments in the State's closing argument:

> But like we talked about in voir dire, the witnesses that come up here and tell you what happened, they get the presumption that they are telling you the truth and until they give you a reason to believe otherwise, you are to believe them. Now what did we hear? There were some inconsistencies. But, again, like we talked about in voir dire, people remember things differently.

*Tr.* at 457. The State continued to argue that its witnesses were more credible based partly on corroboration by the physical evidence presented. The State further contended that Foster's witnesses were less credible due to inconsistencies in their testimony, particularly Brown's, where he (1) claimed to have been at the scene for six to ten minutes before the police showed up, although the IMPD records established that an officer responded two minutes after the 911 call, and (2) stated that no one was attending to Warren's body at

the time he was present, although other testimony established that Genean and two neighbor women were administering CPR to Warren. *Id*. at 461-62.

[16] Foster relies on *Castillo v State*, 974 N.E.2d 458 (Ind. 2012), for his argument that a prosecutor's erroneous statement of the law is misconduct even if such statement is only a "small part of a much longer exposition by the prosecutor in closing argument, was not repeatedly reiterated, and was countered by a correct statement of the law in the final instructions." *Id*. at 469. In that case, the defendant was sentenced to life without parole after the prosecutor's statement during the penalty phase that "told the jury not to compare the mitigating and aggravating factors" and "implored the jury to consider the defendant's unsavory character" in a "colloquy on the defendant's character [that] comprised nearly one-third of the prosecutor's closing statements to the jury." *Id*. at 468-69. Our Supreme Court held that these statements were misconduct because the prosecutor urged the jury to act contrary to law in ignoring the mitigating and aggravating factors and in considering the defendant's character, which was not one of the statutory factors to be considered in making its sentencing decision. *Id*. at 469-70.

[17] Although, pursuant to the holding of *Castillo*, a prosecutor's erroneous statement of the law is misconduct, we do not find that the prosecutor's statements in the present case were erroneous statements of the law. The Indiana Supreme Court has previously held that jury instructions that inform the jury "to presume that every witness was telling the truth" are proper and not error. *Timberlake v. State*, 690 N.E.2d 243, 258-69 (Ind. 1997), *cert. denied*, 525

U.S. 1073 (1999). Here, as the prosecutor's statements in closing argument were not misstatements of the law, we conclude they were proper. The prosecutor did not engage in misconduct; therefore, Foster was not placed in a position of grave peril as a result of the prosecutor's comments.[2]

[18] Notwithstanding that we conclude that there was no prosecutorial misconduct, even had there been, Foster must prove that the State's actions reached the level of fundamental error. "In evaluating the issue of fundamental error, our task in this case is to look at the alleged misconduct in the context of all that happened and all relevant information given to the jury -- including evidence admitted at trial, closing argument, and jury instructions -- to determine whether the misconduct had such *an undeniable and substantial effect on the jury's decision* that a fair trial was impossible." *Ryan*, 9 N.E.3d at 668 (emphasis in original).

[19] In looking at the challenged comments in light of these things, we do not believe that the statements by the prosecutor had a substantial effect on the jury's decision, making a fair trial impossible. The remarks that Foster takes issue with were simply a statement that the jury should start with the theory that *all* witnesses were telling the truth; the prosecutor did not specify that the

---

[2] Foster also contends that the prosecutor's statements during closing constituted improper vouching for the credibility of a witness. "It is inappropriate for the prosecutor to make an argument which takes the form of personally vouching for a witness." *Lainhart v. State*, 916 N.E.2d 924, 938 (Ind. Ct. App. 2009). Vouching occurs when an attorney states a personal opinion as to the credibility of a witness. *Gaby v. State*, 949 N.E.2d 870, 880-81 (Ind. Ct. App. 2011). Here, the prosecutor did not state any personal opinions concerning the credibility of any of the witnesses and, therefore, did not engage in improper vouching.

jury should presume only the State's witnesses were telling the truth. Therefore, the statements suggested to the jury that it should initially presume that both the State's and Foster's witnesses were telling the truth, and until the witnesses gave reason to believe otherwise, the jury was to believe them. The prosecutor's remarks were mentioned only once and not made repeatedly.

[20] The jury was instructed that Foster was presumed innocent and that the presumption continued throughout the trial. The jury was given the following instruction:

> If the evidence in this case is susceptible to two (2) constructions or interpretations, each of which appears to you to be reasonable, and one of which points to the guilt of the Defendant and the other to his innocence, it is your duty under the law to adopt that interpretation which is consistent with the Defendant's innocence and to reject that which points to his guilt.

*Appellant's App*. at 83. The jury was also instructed that it should not disregard the testimony of any witness without a reason and without careful consideration and that if it found conflicting testimony, it must determine which witness to believe and which to disbelieve. *Id*. at 85.

[21] The jury is presumed to follow the trial court's instructions and not law recited by counsel during arguments. *Laux v. State*, 985 N.E.2d 739, 750 (Ind. Ct. App. 2013), *trans. denied. See also Chandler v. State,* 581 N.E.2d 1233, 1237 (Ind. 1991) (observing that it is presumed that a jury will obey a trial court's instructions); *Hudgins v. State,* 451 N.E.2d 1087, 1091 (Ind. 1983) (holding that "[a]ny misstatements of law during closing argument are presumed cured by final

instruction"). Absent evidence to the contrary, we generally presume the jury follows the trial court's instructions in reaching its determination. *Gibson v. State*, 43 N.E.3d 231, 241 n.5 (Ind. 2015), *cert. denied*, 137 S. Ct. 54 (2016). We, therefore, conclude that in the context of all that occurred during the trial and all relevant information given to the jury, the alleged misconduct did not have a substantial effect on the jury's decision, and it has not been proven that a fair trial was impossible. Foster has not shown that error, if any, was fundamental.

Affirmed.

May, J., and Crone, J., concur.