**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**KRISTIN A. MULHOLLAND**
Appellate Public Defender
Crown Point, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ERIC P. BABBS**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| DOUGLAS A. SMITH, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 45A03-1304-CR-154 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable Salvador Vasquez, Judge
Cause No. 45G01-1201-MR-1

**December 11, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

Douglas A. Smith appeals his conviction for murder. Smith raises two issues, which we revise and restate as:

I.      Whether the trial court erred in admitting certain evidence of a prior altercation; and

II.     Whether the State committed prosecutorial misconduct requiring reversal.

We affirm.

FACTS

In January 2012, Smith lived with Jacqueline Williams, his girlfriend of approximately two years, in Highland, Indiana. Williams was employed as a technician in the imaging department at a hospital, and Smith was unemployed.

On the night of January 13, 2012, Williams and her friends went to a bar in Griffith, Indiana, where Smith met them. At some point Smith went home to shower, and later Williams and a friend joined him at a bar in Highland. When Williams was talking to some other women, Smith grabbed her by her upper arm, pulled her upward towards him, and said "[w]hat the f--- do you think you're doing" or "shut the f--- up." Transcript at 48, 383. Williams told Smith to "leave her the f--- alone." Id. at 388. The two continued to argue with each other. At some point prior to 2:15 a.m., Smith and Williams exited the bar and drove to their residence. Smith and Williams were still angry with each other when they left the bar.

After they arrived home, they argued about their relationship. Williams was convinced that Smith did not care about the relationship and was not committed enough, and Smith told her that he loved her and was willing to do anything to commit to the relationship. They took off each other's clothes and began to have sex. Smith kept a gun

2

in one of the bedrooms in the residence, and at some point before 3:00 a.m., he shot Williams in the head causing her death.

Smith called 911 from a bar in Highland at approximately 3:00 a.m., gave the dispatcher a street address, and then hung up. The 911 dispatcher called the bar and asked if there was an emergency. The employee who answered went outside to the parking lot but Smith had already left and then drove to Tennessee and later to Florida. At some point, he threw the gun in a body of water.

Williams did not show up for work on January 15, 2012, and her colleagues became concerned and went to her house. They noticed that Williams's car was at her house and that every light in the house was on, but there was no answer when they knocked on the door. They made a report to police, and the police went to the residence and found the door unlocked.

Police discovered Williams's body in the bedroom on the floor at the foot of the bed. She was positioned on her back and had been shot in her left eye. The bullet had exited the back of her skull and traveled through the floor and into the room below. Her arms were at her side, she was dressed only in a black robe which was open and revealed her naked body from several inches above her waist to her feet, and her knees were bent up and spread apart. In the room beneath the bedroom where Williams's body was found, police discovered a bullet hole in the ceiling, the spent bullet, and blood spatter on the floor directly below the hole in the ceiling.

On the evening of January 15, 2012, Smith called his mother and left a message. On the night of January 16, 2012, law enforcement in Florida identified Smith's vehicle, initiated a stop, and placed Smith under arrest.

## PROCEDURAL HISTORY

On January 17, 2012, the State charged Smith with murder. Smith filed a motion *in limine* arguing that any statements made by Joshua Casner, one of the State's witnesses, or any others regarding prior physical or verbal altercations between Smith and Williams should be excluded because they constituted impermissible character evidence. In its response, the State indicated in part that Casner would describe the relationship between Smith and Williams as volatile in nature due to personally observing physical and verbal abuse and that Casner specifically witnessed an incident at the home of Smith and Williams in the summer of 2011 when Smith and Williams were intoxicated and were in a heated argument which turned physical. The State also filed a notice of intent to elicit testimony pursuant to Ind. Evidence Rule 404(b) pertaining to the nature of the relationship between Smith and Williams as proof of motive, intent, preparation, plan and absence of mistake or accident. On February 8, 2013, prior to the start of trial, Smith filed a motion to withdraw his defense of self-defense.

Smith's jury trial commenced on February 11, 2013. During opening arguments, he argued that he and Williams had a history of drinking, that they were intoxicated on the night Williams was shot, that the loaded gun was a dangerous thing, that a person handling a gun who is inexperienced, intoxicated, and untrained can lead to tragic and horrible accidents, and that this was exactly what happened in this case. During its case in chief, the State called Josh Casner as a witness. Casner testified that he had known Smith since high school and Williams for five years. Smith's defense counsel asked to approach the bench, indicated that the State appeared to be ready to question Casner regarding an incident that occurred at a Labor Day cookout, and noted that the trial court

4

had previously ruled that the State could elicit testimony regarding the incident. Defense counsel noted that, since that time, Smith had withdrawn his defense of self-defense and objected to any testimony regarding the incident, arguing that the relationship or motive of the parties is no longer an issue. The State argued that the testimony also tended to show a lack of mistake or accident. The court then stated that there was no question that the incident was relevant under Evidence Rule 404(b), that whether the evidence should be admitted was a close call, and that under Evidence Rule 403 on balance the evidence was too prejudicial.

After presenting the testimony of another witness, the State asked to approach the bench and again requested permission to question Casner regarding the events which took place on Labor Day of 2011. The State argued that to show motive, case law allows the State to inquire about prior domestic violence in a relationship between a defendant and the victim. The State points out that Smith admitted that he had shot Williams but claimed it was not his intent or motive to do so, and that the probative value of evidence of the incident outweighed the danger of prejudice. The State also noted that the incident occurred just four months before Williams's death. Following a brief recess, the court asked the State to explain the testimony it wished to elicit from Casner, and the State did so. The court noted that it had an opportunity during the recess to review case law, that there was "a drum beat repetition of the defense team of accident and certainly no intent," and that, although it had previously found that Casner's testimony should not be admitted, it now believed that the evidence should be admitted. Id. at 233. The court found that, although the evidence was prejudicial, "given the defense raised and the [] drumbeat repetition of the accident issue," it believed that the probative value outweighed

any prejudice, and allowed the State to recall Casner for the limited purpose of questioning him about the late summer 2011 incident. Id. at 234. Smith objected to the testimony and requested a limiting instruction. The trial court informed the jury that prior wrongs and acts are typically not admissible to prove that a person acted in conformity therewith or to show the person's character but that such evidence was admissible in limited circumstances. The court noted that Casner's testimony regarding the incident was being admitted for the purpose of showing proof of motive, intent, or the absence of mistake or accident.

The State then elicited testimony from Casner that he attended a barbecue at the home of Smith and Williams on Labor Day of 2011 together with five or six other people, that Smith and Williams had been drinking "[a] lot" of alcohol that day, and that everyone was intoxicated. Id. at 238. Casner testified that, while he and another man were in the backyard and Smith and Williams were inside where he could see them through a window, he heard Smith and Williams "cussing and screaming at each other," that he observed Williams "come up [behind Smith and] grab him by the cheek," and that then there was "a whole bunch of screaming after that." Id. at 240. Casner further testified that "then it got louder" and he observed "a fist up in the air come down" and that he then told the other man "we got to go inside." Id. Casner stated that he opened the door, went inside, and observed Smith "on top of [Williams] with both knees on her sides, straddling her," that Smith said "calm down, you crazy b----," and that Williams said "get the f--- off me." Id. at 240-241. Casner said that he observed Smith's fist "go up" twice. Id. at 241. Casner also testified that he and the other man grabbed Smith's arms and pulled him off of Williams, that Smith then went upstairs, and that Williams

6

crawled underneath the kitchen table and was sobbing and in a fetal position rocking back and forth.

Later during the trial, Smith testified that he kept a gun he had purchased in December 2010 in the bedroom. He testified that he and Williams had argued on the morning of January 14, 2012 at the bar, that he had "told her to shut the f--- up," that she had told him "to leave her the f--- alone," and that he and Williams returned home in his vehicle at approximately 2:15 a.m. Id. at 388. Smith testified that, upon entering the house, he and Williams began to argue and that Williams was "convinced that [he did not] care enough about the relationship" and was not "committed enough." Id. at 390. He testified that he and Williams then began to take each other's clothes off but that shortly after that Williams pushed him off of her and started "bringing the argument back up," and that both he and Williams were "very drunk." Id. at 391-392. He stated that Williams followed him into a bedroom, then downstairs to the living room, and then back upstairs to the bedroom, all the while arguing with him. Smith testified that, after returning to the bedroom, he was on the bed and Williams walked in, grabbed the handgun from next to the television, and started to raise it toward Smith.

Smith said that he approached Williams, who was holding the gun with her right hand, that he tried to grab the gun from her, that she backed up, and that he grabbed the gun with his left hand, placing his hand over the cylinder or above the handle of the gun. Smith further testified that he then turned the gun so it was not facing him or Williams, that he and Williams started "pulling the gun back and forth," that Williams "yank[ed] hard" and began to fall to the ground, and that he started "to fall with her." Id. at 409. He testified: "I'm falling and the gun goes off," and that he did not intend to kill her. Id.

at 410.  During cross-examination, Smith again testified that Williams started to fall and that he started to fall with her.  He stated: "I end up almost on top of her and that's when the gun must have gotten turned towards her and the gun goes off."  Id. at 432.  He said that he then shook Williams but she did not respond.  Smith also testified regarding the Labor Day 2011incident, stating that Williams grabbed him by the face, that he restrained her because she was extremely angry and was hitting him, and that he did not strike her.

The State also presented photographic evidence showing the rooms of the residence where Williams was found, the bullet hole in the ceiling and spatter on the floor beneath the hole, and Williams's body as discovered by police.  The photographs of Williams's body showed the position in which she was discovered, the nature of her gunshot injuries, the placement and condition of her arms and hands, and that her left arm was positioned under the bed to an extent.  During closing arguments, the prosecutor presented a visual slide regarding flight of a defendant, and a visual demonstration of the events leading to the shooting in an attempt to show that the events could not have occurred the way Smith claimed.  Smith objected and moved for a mistrial on these bases, and the court denied Smith's requests.  The jury received final jury instructions on the crime and the elements of murder and the lesser included offenses of voluntary manslaughter and reckless homicide.  The jury found Smith guilty of murder.  The court sentenced him to fifty-five years in the Department of Correction.

## DISCUSSION

Smith argues the trial court should have excluded evidence of the Labor Day 2011 altercation and that during closing argument the prosecutor committed prosecutorial misconduct requiring reversal.

8

The first issue is whether the court erred in admitting evidence of the altercation between Smith and Williams on Labor Day of 2011. The admission and exclusion of evidence falls within the sound discretion of the trial court, and we review the admission of evidence only for abuse of discretion. Wilson v. State, 765 N.E.2d 1265, 1272 (Ind. 2002). An abuse of discretion occurs "where the decision is clearly against the logic and effect of the facts and circumstances." Smith v. State, 754 N.E.2d 502, 504 (Ind. 2001). "Errors in the admission or exclusion of evidence are to be disregarded as harmless error unless they affect the substantial rights of a party." Fleener v. State, 656 N.E.2d 1140, 1141 (Ind. 1995) (citations omitted).

Smith contends that the evidence of the altercation on Labor Day of 2011 was improper character evidence and should have been excluded under Ind. Evidence Rules 404(b). He argues that there were many ways to demonstrate the essence of his relationship with Williams without the introduction of the prejudicial prior act, that he was portrayed as a man who would strike his girlfriend in anger, and that this likely led the jury to the forbidden inference that he was capable of purposely shooting her. The State maintains that the challenged evidence was admissible under Ind. Evidence Rule 404(b) and that a defendant's prior acts against a victim of a homicide are relevant to show the hostile relationship between the parties and the defendant's motive for committing the crime and to rebut Smith's claim of an accidental shooting. The State further argues that, while incidents of domestic violence may have less probative value if they are remote in time, here the Labor Day altercation happened less than five months before Williams's death and in the same residence where she was found. The State also

points out that Smith brought up the Labor Day incident during his own direct testimony, that defense counsel referred to the incident during his closing argument in an attempt to lend plausibility to Smith's version of the fatal shooting, and that Smith was not denied a fair trial.

Ind. Evidence Rule 404(b) provides:

*Other Crimes, Wrongs, or Acts*.  Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pre-trial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

The standard for assessing the admissibility of Rule 404(b) evidence is: (1) the court must determine that the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act; and (2) the court must balance the probative value of the evidence against its prejudicial effect pursuant to Rule 403.  Boone v. State, 728 N.E.2d 135, 137-138 (Ind. 2000), reh'g denied; Hicks v. State, 690 N.E.2d 215, 221 (Ind. 1997).  The evidence is inadmissible when the State offers it only to produce the "forbidden inference" that the defendant has engaged in other, uncharged misconduct and the charged conduct was in conformity with the uncharged misconduct.  Crain v. State, 736 N.E.2d 1223, 1235 (Ind. 2000).  The trial court has wide latitude, however, in weighing the probative value of the evidence against the possible prejudice of its admission.  Id.  If evidence has some purpose besides behavior in conformity with a character trait and the balancing test is favorable, the trial court can elect to admit the evidence.  Boone, 728 N.E.2d at 138.  For instance, evidence

10

which is necessary for the jury to understand the relationships between the victim, various witnesses, and the defendant may be admissible. See Wilson v. State, 765 N.E.2d 1265, 1270-1271 (Ind. 2002).

The record reveals that Casner testified, as set forth above, that Smith and Williams had a verbal and physical altercation on Labor Day of 2011, that he heard Smith and Williams screaming at each other, that he observed Williams pull Smith's cheek and Smith bring his fist down and his fist go up two times, that he and another person went inside and pulled Smith off of Williams, and that Williams crawled under the kitchen table and was sobbing and in a fetal position rocking back and forth. This evidence demonstrated the sometimes hostile and physical nature of the relationship between Smith and Williams and is relevant to whether Williams was or was not the victim of an accidental shooting. See Ross v. State, 676 N.E.2d 339, 346 (Ind. 1996) (holding that prior misconduct was "admissible because it demonstrated the defendant's motive and intent to commit the murder and illuminated the relationship between the defendant and victim"); Elliott v. State, 630 N.E.2d 202, 204 (Ind. 1994) (prior threats of violence to ex-wife and victim admissible to show the relationship between the parties and defendant's motive), reh'g denied; Price v. State, 619 N.E.2d 582, 584 (Ind. 1993) (prior bad acts against the victim are admissible "to show the relationship between the parties and appellant's motive"), reh'g denied; Iqbal v. State, 805 N.E.2d 401, 408-409 (Ind. Ct. App. 2004) (holding that evidence relating to a prior incident in which the defendant put a gun to the victim's head and threatened to kill her was indicative of the defendant's relationship with the victim and highly relevant for his motive to shoot the victim, that the defendant's "assertion of an accident is indicative of the nature of the relationship

between the parties, characterized by jealousy and denial, and ultimately culminating into hostility and murder," that the evidence was "relevant to show the absence of the gun accidentally being fired," and that the trial court did not abuse its discretion by admitting the defendant's bad acts under Rule 404(b)).

In addition, the testimony of the altercation was not overly graphic or otherwise significantly prejudicial. The trial court explained to the jury that the testimony should be considered for the limited purposes of showing proof of motive, intent, or the absence of mistake or accident, and we cannot say that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. See Hicks, 690 N.E.2d at 223 (noting that "at some point testimony about every incident of violence between the two becomes more prejudicial than probative," that evidence of two of the incidents illustrated the hostile relationship that could have been a motive for murder, that evidence of a third incident was graphic and of fairly low probative value in view of its remoteness in time and thus inadmissible, and that considered in light of the other evidence about the relationship the improperly-admitted evidence regarding the third incident was not grounds for reversal). The trial court did not abuse its discretion in admitting the challenged evidence of Smith's altercation with Williams on Labor Day of 2011, and the admission of the evidence is not grounds for reversal.

## II.

The next issue is whether any prosecutorial misconduct requires reversal of Smith's conviction. Smith asserts that the misstatements of law and fact during the prosecutor's closing argument amounted to prosecutorial misconduct which placed him in grave peril and hampered his right to a fair trial, and that the trial court erred in

12

denying his motions for mistrial. Smith specifically argues that prosecutorial misconduct occurred when the prosecutor attempted to present to the jury an instruction regarding evidence which tends to show an attempt to conceal or suppress and presented a visual demonstration of the events leading to the shooting and in doing so inaccurately portrayed the evidence.

In reviewing a claim of prosecutorial misconduct, we determine: (1) whether the prosecutor engaged in misconduct, and if so, (2) whether that misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she should not have been subjected. Coleman v. State, 750 N.E.2d 370, 374 (Ind. 2001). The "gravity of peril" is measured by the "probable persuasive effect of the misconduct on the jury's decision, not on the degree of impropriety of the conduct." Id. When deciding whether a mistrial is appropriate, the trial court is in the best position to gauge the surrounding circumstances and the potential impact on the jury. Stephenson v. State, 742 N.E.2d 463, 482 (Ind. 2001), cert. denied, 534 U.S. 1105, 122 S. Ct. 905 (2002). A mistrial is "an extreme remedy granted only when no other method can rectify the situation." Overstreet v. State, 783 N.E.2d 1140, 1155 (Ind. 2003). The denial of a mistrial lies within the sound discretion of the trial court, and will be reversed only upon a finding of an abuse of discretion. Coleman, 750 N.E.2d at 375. An abuse of discretion occurs where the decision is clearly against the logic and effect of the facts and circumstances. Smith, 754 N.E.2d at 504.

A.      Reference to Flight

The State initially requested that the jury receive an instruction regarding consciousness of guilt which could include escape or fleeing from the scene of the crime,

13

and the court denied the request. At one point during the State's closing argument, the prosecutor argued "[t]here's some law I would like to make you aware of" that "isn't going to be in the final instructions." Transcript at 503-504. Smith objected and stated it would be improper for the State to discuss law not included in the jury instructions. During a sidebar, Smith argued that the State could not argue flight as being evidence of guilt and moved for a mistrial. The trial court told the prosecutor: "You can [] argue as advocate [] that the evidence would show that him fleeing the scene should be – or you can construe that as evidence of guilt . . . ." Id. at 506. The court then told the prosecutor "[d]o not put up that screen again"[1] and denied Smith's request for mistrial. Id. The court then admonished the jury stating: "I didn't quite see what was up there. But what was [] up there . . . was something about flight and [the prosecutor] indicated this is the law, that there is law out there – the answer is that it is not. You know, what was up there is not the law of this case. [The prosecutor] can make an argument as advocate for the State of Indiana . . . on how you may construe the defendant's actions, that's not the applicable law in this case. Applicable law in this case will be given to you by way of final instruction. Please keep that in mind." Id. at 506-507. The final jury instructions provided that "[t]he unsworn statements or comments of counsel on either side of the case should not be considered as evidence in the case." Appellant's Appendix at 203. The jury instructions also provided that the instructions are the best source as to the law applicable to the case.

We have observed that it is proper for a prosecutor to argue both law and fact during final argument. Neville v. State, 976 N.E.2d 1252, 1261 (Ind. Ct. App. 2012)

---

[1] From the transcript, it appears that the prosecutor was presenting a slide presentation.

14

(citation omitted), trans. denied. In judging the propriety of a prosecutor's remarks, we consider statements in the context of the argument as a whole. Seide v. State, 784 N.E.2d 974, 977 (Ind. Ct. App. 2003). The Indiana Supreme Court has noted that flight and related conduct may be considered by a jury in determining a defendant's guilt. Dill v. State, 741 N.E.2d 1230, 1232 (Ind. 2001). The Court further noted that, "although evidence of flight may under appropriate circumstances be relevant, admissible, and a proper subject for counsel's closing argument, it does not follow that a trial court should give a discrete instruction highlighting such evidence" and that "instructions that unnecessarily emphasize one particular evidentiary fact, witness, or phase of the case are disapproved." Id. The jury is presumed to follow the trial court's instructions and not law recited by counsel during arguments. Laux v. State, 985 N.E.2d 739, 750 (Ind. Ct. App. 2013), trans. denied.

Given the extent and nature of the challenged comments regarding flight, the trial court's admonishment to the jury, and the jury instructions, we conclude that any prejudicial impact caused by the prosecutor's statements was minimal and that Smith was not placed in a position of grave peril to which he should not have been subjected. See Wright v. State, 690 N.E.2d 1098, 1112 (Ind. 1997) (holding that the defendant was not placed in a position of grave peril where an improper comment by the prosecutor was fleeting and the jury was instructed that comments of counsel were not evidence), reh'g denied. Moreover, to the extent the court may have erred with respect to sufficiently admonishing the jury, we find any such error harmless based upon the evidence and in light of the limited extent of the prosecutor's comments in the context of the argument as

15

a whole. We cannot say the trial court abused its discretion in denying Smith's motion for mistrial on this basis.

B.     Demonstration

We next turn to Smith's argument regarding the State's demonstration of the events leading to the shooting. During the State's rebuttal closing argument, the prosecutor argued that it was physically impossible for the shooting to have occurred the way Smith said that it did, and a deputy prosecutor and a detective attempted to present a demonstration of Smith's version of events. Smith objected to the demonstration on the basis that it was testimonial, and the court overruled the objection, stating and cautioning the jury that the presentation was demonstrative only. Smith interjected that the State's demonstration indicated Smith used his right hand to grab the gun although Smith had indicated he had used his left hand, and the court reiterated that the prosecutor's argument was persuasive only and instructed the jury that their memory of the evidence presented during the trial is what mattered. The State presented the demonstration indicating a struggle between Smith and Williams, how they would have fallen, and where the gun would have been when it discharged. Defense counsel moved for a mistrial, and the court denied the motion.

Smith essentially contends on appeal that the prosecutor's demonstration misstated or mischaracterized his testimony and that the misconduct placed him in grave peril. Again, this court has observed that it is proper for a prosecutor to argue both law and fact during final argument and propound conclusions based upon the prosecutor's analysis of the evidence. Neville, 976 N.E.2d at 1261 (citation omitted). We also note, however, that a prosecutor's comments can be prejudicial if they have an impact on the jury's

16

ability to judge the evidence fairly. Id. (citation omitted). Prosecutors may not argue facts not in evidence. Id.

We note that the heart of Smith's defense was that the shooting resulting in Williams's death was accidental and thus that he had not intended to kill her. In light of Smith's defense and testimony attempting to explain his version of how the shooting occurred, the State argued that the shooting was not an accident and pointed to evidence to support its position. The demonstration was an attempt to convince the jury that Smith's version of the shooting—including a struggle over the gun and the gun accidentally discharging—was not believable based upon where Williams sustained a gunshot, how her body was positioned, and the condition and position of her hands.

The demonstration comprises approximately four pages of the State's seventeen-page rebuttal argument in the trial transcript. The jury heard an extended argument by the prosecutor that the shooting was not an accident as Smith claimed, citing the position of Williams's body, the fact that the bullet traveled from her eye through her head, through her skull, and then through the floor, and the evidence which showed that Williams was pinned to the floor and helpless when Smith pulled the trigger. During the demonstration, the prosecutor argued that no struggle had occurred between Smith and Williams in the manner Smith had testified, noted the position of Williams's limbs and where the gun would have been discharged, and argued that Williams's hands "were not on that gun" and that "[t]he story does not add up." Transcript at 528.

Moreover, after the court denied Smith's motion for a mistrial, the prosecutor specifically argued that the position and condition of Williams's body on the floor, including the facts that her knees were propped up, her legs were spread wide and almost

17

tucked underneath her, and she had scratches on her stomach, indicated that Williams had not just fallen to the floor when the gun was discharged but that she was pinned to the floor and attempting to break free from Smith. The State argued that the photographs suggest that Smith straddled Williams, that her legs were trying to get traction to crawl away from him, and that he restrained her. The State further argued that the photographs showing the condition of Williams's hands indicated there was no stippling, blowback, or blood, that the photographs showing the condition of her face indicated there was stippling on her face, and that if Williams's hands had been near the gun and her face when the gun discharged as Smith claimed then there would have been stippling on her hands as well and some kind of other injury to her hand if it were on the cylinder of the revolver. The State argued that the items around Williams's body, including a dish and trinkets, were not disturbed, that the bed was right next to where Williams fell, that a free fall would have shaken something, and that the photographs indicate that nothing was moved and that no free fall occurred. The State also argued that Smith was angry, noted that there was no way that Smith looked at Williams and did not see the gunshot wound when he shook her, pointed to Smith's demeanor while testifying, argued that he was controlling and showed no emotion and blamed Williams's actions for the shooting, and that he had lied about the shooting being an accident.

We note that the jury viewed the photographic evidence of Williams's body and the position of her limbs. The detective who was responsible for the investigation of Williams's death testified that he believed Smith had murdered Williams based upon the positioning of Williams's body, the tumultuous relationship of Smith and Williams, and Smith's conduct after the shooting. The detective testified that he believed Williams was

18

flat on her back when the shot that killed her was fired. The evidence shows that the bullet, fired from within approximately three feet, entered Williams's head through her left eye, angled slightly upwards, fractured her eyeball and the base of her skull, passed through her brain, fractured the top of her skull, and exited her head and traveled through the floor and into the room below. Blood pooled behind Williams's head and dripped through the bullet hole in the floor and into the room below. The evidence shows that Williams's arms were at her side, she was dressed only in a black robe which was open and revealed her naked body from several inches above her waist to her feet, and her knees were bent up and spread apart. Evidence was presented to the jury from which it could have concluded that Williams was pinned against the floor by Smith, that her arms and hands were not on or around the gun when it discharged, and that she had not just fallen to the floor when she was shot based on the position and condition of her body, legs, arms, one of which was under the bed, and hands, which showed none of the blowback or blood spatter which was visible on her face and surrounding area. Further, the court admonished the jury that, to the extent the demonstration differed from Smith's testimony, their memories are what mattered, and the jury was instructed that the comments of counsel should not be considered as evidence in the case.

Based upon the evidence before the jury and the arguments of the State and Smith's defense as a whole, and especially in light of the trial court's admonishment and the final jury instructions, we conclude that even if it was misconduct, the prosecutor's demonstration did not impact the jury's ability to judge the evidence fairly and did not place Smith in a position of grave peril to which he should not have been subjected. The trial court did not abuse its discretion in denying Smith's motion for mistrial on this basis.

19

CONCLUSION

For the foregoing reasons, we affirm Smith's conviction for murder.

Affirmed.

NAJAM, J., and MATHIAS, J., concur.