## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEYS FOR APPELLANT

Aaron Westlake
Bradley Kim Thomas II
Thomas Law Firm, P.C.
Auburn, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

George P. Sherman
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| DeShawn Belcher, *Appellant-Defendant,* | December 11, 2015 |
| v. | Court of Appeals Case No. 02A03-1505-CR-306 |
| | Appeal from the Allen Superior Court |
| State of Indiana, *Appellee-Plaintiff* | The Honorable John F. Surbeck, Jr., Judge |
| | Trial Court Cause No. 02D06-1409-FB-137 |

**Robb, Judge.**

# Case Summary and Issues

[1] Following a jury trial, DeShawn Belcher was convicted of unlawful possession of a firearm by a serious violent felon, a Class B felony, and possession of marijuana as a Class D felony. Belcher appeals, raising the following issues for our review: (1) whether the State presented sufficient evidence to support his convictions; and (2) whether the State committed prosecutorial misconduct amounting to fundamental error. Concluding the State presented sufficient evidence and finding no fundamental error occurred, we affirm Belcher's convictions.

# Facts and Procedural History

[2] On April 10, 2014, officers of the Fort Wayne Police Department went to a house located on Gaywood Drive to execute an arrest warrant for Quinn James. The officers surrounded the residence and ordered James to come outside. James complied, emerging from the residence approximately ten minutes later. When James was taken into custody, the arresting officer noticed "a very strong odor of marijuana, raw marijuana" on James' person. Transcript at 142.

[3] Belcher and his mother, Sabrina Belcher, approached Detective David Wilkins, who was standing outside the house. They asked Detective Wilkins what was going on, and he explained the police were "holding the house for right now" because "a warrant subject . . . just came out of the house." *Id.* at 131. At some

point unclear from the record, Detective Wilkins learned Sabrina owned the house. He asked Sabrina if she would consent to a search of the house, but Sabrina said she would need to speak to an attorney before consenting to a search and left the scene.

[4] After Sabrina left, Belcher informed Detective Wilkins that he and a friend had smoked marijuana in the house earlier that day and "there might be a marijuana roach in the ashtray . . . ." *Id.* at 133. Belcher also admitted "he sprayed the house with a perfume or deodorizer to get the smell [of marijuana] out of the house." *Id.* Belcher stated although his mother owns the house on Gaywood Drive, she lives in a house on Taylor Street, and he lives in the house on Gaywood Drive.[1]

[5] The police obtained a search warrant for the house on Gaywood Drive and executed the search just before midnight on April 10.[2] As Belcher foretold, the officers found marijuana "roaches" in an ashtray in the basement of the house.[3] In addition, the officers discovered three firearms: an AK-47-style rifle underneath the sofa in the living room, a twelve-gauge shotgun in a closet in the hallway, and a Colt AR-15 rifle in plain view in the master bedroom. The AR-

---

[1] Belcher's mother was not at the Gaywood Drive house when the police arrived. She went to the house after someone called her and told her the police were surrounding the house. The record is unclear as to Belcher's whereabouts prior to his conversation with Detective Wilkins.

[2] The record does not include the search warrant or the search warrant affidavit. Based on the testimony of the officers at trial, it appears the officers relied on Belcher's statements to Detective Wilkins and the odor of raw marijuana on James' person to establish probable cause for the search. *See* Tr. at 133-35, 142-43.

[3] A "roach" is the burnt end of a marijuana cigarette. Tr. at 232.

15 rifle was found leaning against a wall. In the same bedroom, the officers uncovered a shoe box containing approximately 550 grams of marijuana. The shoe box, one of several against a wall, also contained a digital scale and a debit card in DeShawn Belcher's name. Inside a dresser in the bedroom, officers discovered another digital scale, a small baggie of marijuana, mail addressed to DeShawn Belcher at the Gaywood Drive house, and DeShawn Belcher's wallet, which contained his driver's license, Social Security card, and a second debit card in his name. Another small baggie of marijuana was found underneath a pillow on the bed. A magazine fully loaded with ammunition for an AR-15 rifle was found next to the bed, on the floor. In a cabinet in the bathroom connected to the bedroom, the officers discovered additional ammunition for an AR-15 rifle. In the kitchen, the officers found several unidentified pills, a baggie of suspected cocaine,[4] and a third digital scale.

[6] The State charged DeShawn Belcher with unlawful possession of a firearm by a serious violent felon, a Class B felony,[5] and possession of marijuana in an amount greater than thirty grams, a Class D felony. A jury trial was held in March 2015. Tara Mickem, Belcher's former girlfriend, testified Belcher lived with her from December 2013 to August 2014. Sabrina testified she owns the Gaywood Drive house and lives there, and her son did not live there in April

---

[4] The probable cause affidavit indicates the chalky, off-white substance in the baggie field-tested positive for cocaine.

[5] Belcher has a prior conviction for dealing in cocaine as a Class B felony. *See* Ind. Code § 35-47-4-5(b)(23) (defining dealing in cocaine as a serious violent felony).

2014. She stated Belcher would occasionally spend the night in her basement but was staying with his cousin and Mickem in April 2014. She testified the master bedroom was her bedroom and the firearms found in the house belonged to her, but she denied having knowledge of the drugs or the scales found in the house. She admitted she occasionally stays at her boyfriend's house on Taylor Street.

[7] The jury found Belcher guilty as charged. Thereafter, the trial court ordered Belcher to serve an aggregate sentence of twelve years in the Indiana Department of Correction, with thirty-seven days of credit for time served and two years suspended to probation. This appeal followed.

# Discussion and Decision

## I. Sufficiency of Evidence

### A. Standard of Review

[8] Belcher contends the State presented insufficient evidence to support his convictions for unlawful possession of a firearm by a serious violent felon and possession of marijuana. When reviewing the sufficiency of the evidence to support a conviction, we consider only the probative evidence and reasonable inferences supporting the verdict. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). We neither reweigh the evidence nor assess the credibility of witnesses. *Id.* Unless no reasonable fact-finder could conclude the elements of the crime were proven beyond a reasonable doubt, we will affirm the conviction. *Id.*

# B. Constructive Possession

A person actually possesses contraband when he has direct physical control over it, but "a conviction for a possessory offense does not depend on catching a defendant red-handed." *Gray v. State*, 957 N.E.2d 171, 174 (Ind. 2011). When the State cannot show actual possession, a conviction may rest instead on proof of constructive possession. *Id.* A person constructively possesses an item when he has both the capability and the intent to maintain dominion and control over the item. *Id.* Here, the State prosecuted Belcher under a theory of constructive possession.

If a person has exclusive possession of the premises where an item is found, "the law infers that the party in possession of the premises is capable of exercising dominion and control over all items on the premises." *Gee v. State*, 810 N.E.2d 338, 340-41 (Ind. 2004). But when a person's possession of the premises is non-exclusive, the inference of intent to maintain dominion and control must be supported by "additional circumstances" pointing to the defendant's knowledge of the nature of the items and their presence. *Id.* at 341 (quotation omitted). Possible "additional circumstances" include: (1) incriminating statements by the defendant, (2) attempted flight or furtive gestures, (3) a setting that suggests drug manufacturing, (4) the proximity of the contraband to the defendant, (5) whether the contraband was found in plain view, and (6) the mingling of the contraband with other items the defendant owns. *Id.*

[11] Belcher contends the State failed to demonstrate he had the requisite capability and intent to maintain dominion and control over the firearms and marijuana found in the Gaywood Drive house. We conclude Belcher's possession of the premises was non-exclusive, but the State presented sufficient evidence of "additional circumstances" demonstrating Belcher had knowledge of the nature of the items and their presence. First, Belcher made incriminating statements to Detective Wilkins, admitting he smoked marijuana in the house earlier that day and attempted to mask the odor with an air freshener. He also told Detective Wilkins "there might be a marijuana roach in the ashtray . . . ." Tr. at 133. Then, when the officers entered the house, they discovered the AR-15 rifle in plain view, leaning against a wall in the bedroom where they found Belcher's driver's license, his Social Security card, two debit cards in his name, and mail addressed to him at the Gaywood Drive house. One of the debit cards was found in the shoebox that contained approximately 550 grams of marijuana, and one of the small baggies of marijuana was found in the dresser where the officers discovered Belcher's wallet and mail. Finally, it is worth noting the AR-15 rifle was discovered in plain view in the only room in the house where the police found raw marijuana. Given Belcher's statements to Detective Wilkins, the rifle's location strongly suggests Belcher had knowledge of its presence. For these reasons we find the evidence is more than sufficient to

demonstrate Belcher constructively possessed the marijuana and at least one of the firearms discovered in the Gaywood Drive house.[6]

## II. Prosecutorial Misconduct

### A. Standard of Review

[12] Belcher also contends the prosecutor engaged in misconduct. In reviewing a properly preserved claim of prosecutorial misconduct, we first determine whether misconduct occurred, and then, if there was misconduct, whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he otherwise would not have been subjected. *Castillo v. State*, 974 N.E.2d 458, 468 (Ind. 2012). Whether a prosecutor's statements constitute misconduct is measured by reference to case law and the Rules of Professional Conduct. *Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006). The degree of peril is measured by the probable persuasive effect of the misconduct on the jury's decision. *Id.*

[13] To preserve a claim of prosecutorial misconduct for appeal, "a defendant must not only raise a contemporaneous objection, he must also request an admonishment and, if the admonishment is not given or is insufficient to cure the error, then he must request a mistrial." *Washington v. State*, 902 N.E.2d 280,

---

[6] Because the State presented sufficient evidence to prove Belcher constructively possessed the AR-15 rifle, we need not address the sufficiency of the evidence as to the twelve-gauge shotgun found in the hallway closet or the AK-47-style rifle found underneath the sofa in the living room. The charging information did not specify which firearm Belcher possessed in violation of Indiana Code section 35-47-4-5.

289-90 (Ind. Ct. App. 2009), *trans. denied*. Failure to request an admonishment or a mistrial waives the claim of prosecutorial misconduct unless the defendant can demonstrate the misconduct amounted to fundamental error. *Castillo*, 974 N.E.2d at 468. "Fundamental error is an extremely narrow exception to the waiver rule where the defendant faces the heavy burden of showing that the alleged errors are so prejudicial to the defendant's rights as to make a fair trial impossible." *Ryan v. State*, 9 N.E.3d 663, 668 (Ind. 2014) (citation and internal quotation marks omitted). To establish fundamental error, the defendant must show the trial court erred in not *sua sponte* raising the issue because the alleged error (1) constitutes a blatant violation of basic principles of due process; and (2) presents an undeniable and substantial potential for harm. *Id.*

[14] Having failed to preserve his claims for appeal, Belcher must establish the grounds for prosecutorial misconduct as well the grounds for fundamental error.[7] Belcher contends the prosecutor engaged in several instances of misconduct, which individually or cumulatively resulted in fundamental error: (1) misstating evidence while cross-examining Sabrina; (2) misrepresenting evidence during closing argument; (3) impermissibly commenting on Sabrina's credibility; and (4) making improper remarks during closing argument. We will address each allegation in turn.

---

[7] Belcher objected to only one of the instances of alleged misconduct but did not thereafter request an admonishment or a mistrial. The trial court *sua sponte* admonished the jury, and Belcher did not request a mistrial.

# B. Misstating Evidence

First, Belcher contends the prosecutor engaged in misconduct by misstating evidence while cross-examining Sabrina. Belcher points to the prosecutor's attempt to impeach his mother's testimony using a firearm trace from the Department of Justice.[8] Specifically, in reference to the rifle discovered underneath the sofa in the living room—which Sabrina stated had belonged to her late husband, who died in 1999—the prosecutor asked, "So why is it that that wasn't purchased and sold to somebody until 2011, to somebody in Texas?" Tr. at 263. When Belcher objected to the question on the basis of misstating evidence, the prosecutor said she was referring to "the AR rifle, not the Colt." *Id.* Our review of the record indicates the prosecutor was confusing the AK-47-style rifle, found underneath the sofa, with the Colt AR-15 rifle, found in the bedroom.

Belcher contends the prosecutor's misstatement amounted to misconduct because it was "undoubtedly very damaging" to his mother's credibility. Appellant's Brief at 14. Belcher objected to the prosecutor's question but did not request an admonishment. Nonetheless, the trial court *sua sponte* admonished the jury to "rely on your recollection of the testimony." Tr. at 264.

---

[8] In order to provide investigative leads in the fight against violent crime, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") systematically tracks the movement of firearms recovered by law enforcement officials from first sale by the manufacturer or importer, through the distribution chain, to the first retail purchaser. *National Tracing Center*, ATF (June 19, 2015), https://www.atf.gov/firearms/national-tracing-center.

Belcher did not request a mistrial after the admonishment, and the prosecutor did not continue to question Sabrina about the acquisition of the rifles. The prosecutor moved on to questions about the marijuana found in the bedroom. Therefore, to the extent the admonishment sufficiently cured the alleged harm, Belcher's claim of prosecutorial misconduct fails. *See Donnegan v. State*, 809 N.E.2d 966, 974 (Ind. Ct. App. 2004) (stating a timely and accurate admonition is generally an adequate curative measure for any prejudice resulting from an improper comment made by a prosecutor), *trans. denied*. To the extent misconduct occurred and the admonishment was inadequate, Belcher waived his claim by failing to request a mistrial, and he has not demonstrated the prosecutor's brief mix-up was so prejudicial "as to make a fair trial impossible." *Ryan*, 9 N.E.3d at 668. If anything, the prosecutor's confusion and unpreparedness impacted her own credibility in the eyes of the jury, not the credibility of the witness.

## C. Misrepresenting Evidence

[17]     Second, Belcher argues the prosecutor misrepresented evidence during closing argument by making references to "blunts" and by stating Sabrina's testimony was inconsistent with Mickem's testimony. It is proper for a prosecutor in closing argument to propound conclusions based upon her analysis of the evidence. *Neville v. State*, 976 N.E.2d 1252, 1261 (Ind. Ct. App. 2012), *trans. denied*. However, a prosecutor may not argue facts not in evidence, nor advance arguments that impact the jury's ability to judge the evidence fairly. *See id.*; Ind. Professional Conduct Rule 3.4(e) ("A lawyer shall not . . . in trial,

allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence . . . .").

[18] As to the prosecutor's references to "blunts," Belcher argues her statements were improper because none of the witnesses testified Belcher referred to the marijuana as a "blunt." Belcher told Detective Wilkins that he had smoked marijuana in the house and "there might be a marijuana roach in the ashtray . . . ." Tr. at 133. But the prosecutor stated Belcher told Detective Wilkins, "You're gonna find a marijuana blunt in there." *Id.* at 293. She defined a "blunt" as a cigar wrapper packed with marijuana and pointed out, in a photograph of the master bedroom, a package of cigars laying on the bed. *Id.* at 297-98. The prosecutor argued, "Look at that, cigars. What did the Defendant tell you about what they were doing earlier that day? Smoking a blunt . . . ." *Id.*

[19] Officers did find marijuana "roaches" in an ashtray in the basement, but the "roaches" were not photographed or collected as evidence. The "roaches" in the ashtray may well have been the burnt ends of "blunts," but Belcher never stated he had been smoking "blunts." On the other hand, Belcher did not specify the method by which he had been smoking marijuana. Nonetheless, Belcher argues the prosecutor committed misconduct by misrepresenting Belcher's statements in order to connect him to the bedroom where the marijuana and AR-15 rifle were found.

[20]     Although we agree the prosecutor was arguing facts not in evidence, we are not persuaded the error was fundamental. "[G]ravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct." *Cooper*, 854 N.E.2d at 835. Here, in terms of linking Belcher to the bedroom, the evidence actually presented at trial was far more compelling than the prosecutor's argument regarding the cigars. The police found Belcher's driver's license, Social Security card, debit cards, and mail in the bedroom, in close proximity to the marijuana and the AR-15 rifle. As discussed above, this evidence was more than sufficient to prove Belcher constructively possessed the marijuana and the AR-15 rifle. In light of all the evidence presented at trial, we do not believe the prosecutor's remarks "had such an undeniable and substantial effect on the jury's decision that a fair trial was impossible." *Ryan*, 9 N.E.3d at 668 (alteration omitted).

[21]     As to the inconsistencies between Sabrina's testimony and Mickem's testimony, the prosecutor stated in closing argument,

> And then you have Tara Mickem, she says, "Mr. Belcher lived with me between October, 2013, and August, 2014."[9] And he was living with her in April of 2014, obviously, 'cause it's fits [sic] within there. But his mom said he lived with her niece, Teigh. Remember her saying that? She didn't confirm what Tara said. Tara says, "He lived with me." Mom says, "He lived

---

[9] Mickem testified Belcher moved in October 2012 but briefly lived elsewhere from October 2013 to December 2013. According to Mickem, Belcher moved back in December 2013 and lived with her until August 2014. The prosecutor therefore misstated Mickem's testimony, but the difference is inconsequential for our purposes, given the relevant period of time was April 2014.

with my niece, Teigh." Really? They don't even match, it doesn't make sense.

Tr. at 303-04. Belcher argues the prosecutor committed misconduct because their testimony was not in fact inconsistent. We disagree.

Sabrina testified Belcher was living with Mickem *and* his cousin in April 2014: "He was staying with my niece Teigh . . . and his girlfriend, Tara, he stayed with both of them." *Id.* at 252. But Mickem testified Belcher lived with her from December 2013 to August 2014 and did not move in with his cousin until August 2014. When asked where Belcher lived in April 2014, Mickem said Belcher lived with her and did not mention Teigh. The testimony was arguably inconsistent, though not exactly in the way the prosecutor suggested. Nonetheless, we conclude there was some basis in the record for the prosecutor's argument, and the statement likely had no effect on the jury's ability to judge the evidence fairly. *See Neville*, 976 N.E.2d at 1261. We find no fundamental error here.

## C. Witness Credibility

Third, Belcher argues the prosecutor committed misconduct by improperly commenting upon Sabrina's credibility. Indiana Professional Conduct Rule 3.4(e) prohibits a lawyer from stating a "personal opinion" as to the credibility of a witness at trial. But where the evidence introduced at trial suggests a witness was lying, comments by the prosecutor that merely point out incongruities or invite the jury to determine which witness was lying do not

constitute misconduct. *Cooper*, 854 N.E.2d at 836. "[A] prosecutor may comment on the credibility of the witnesses as long as the assertions are based on reasons which arise from the evidence." *Id.* (quoting *Lopez v. State*, 527 N.E.2d 1119, 1127 (Ind. 1988)).

[24] Here, the prosecutor argued,

> [T]hen think about the logic and the reasonableness of Sabrina Belcher's testimony . . . . She approaches the detective and says, "That's my home." He says, "Can we search?" "No. I'm gonna go talk to my lawyer. I need to talk to my lawyer." And she has to go somewhere to get whatever information she has . . . . *I asked her on the stand, and she's a mother, and you know, give her credit for standing by her son, but you can't give her credit for lying, because what does she say, too?* She says, "They're my guns, my house, he doesn't live there." Her son is charged with illegal possession of a firearm, possession of marijuana. I asked her, "Why didn't you tell the police? Why didn't you contact the police and say, 'You've got a big mistake, a big mistake?'" "I don't know where the police department is. I don't know how to do that." She has a lawyer. Don't you think a lawyer knows how to contact the police? Think about the reasonableness of that statement . . . .

Tr. at 322-23 (emphasis added). Then, the prosecutor discussed Sabrina stating her daughter and granddaughters live with her in the Gaywood Drive house but that no one else knew she possessed the firearms found inside:

> [A]lso think about the reasonableness of the statement where she talks about that these are her guns and nobody knows about it. She has two (2) grandchildren . . . in her house . . . . She wants you to believe that she has grandchildren—and this isn't about being a bad person, this is about the reasonableness of what she says—having young children in a home with assault rifles that

are loaded within their reach, that she's not gonna tell anybody, that she's not gonna tell her daughter so that her daughter can be cognizant of the location of those weapons when those kids are around, that they're not gonna have a safety talk with these children about not touching it. Would anybody do that? Would anybody have loaded weapons in their home within reach of children and not have some conversation with other people in the home or with those children about safety? That is not reasonable.

*Id.* at 323-24.

[25] Belcher contends the prosecutor committed misconduct by telling the jury it could give Sabrina "credit for standing by her son, but [it] can't give her credit for lying . . . ." *Id.* at 323. Specifically, Belcher argues the prosecutor improperly commented upon the credibility of a witness because her suggestion that Sabrina was lying was not sufficiently connected to evidence presented at trial. We disagree because the statement plainly arises from Sabrina's testimony regarding why she did not tell the police the firearms belonged to her and her assertion that no one else knew she possessed the firearms. *See Cooper*, 854 N.E.2d at 836. Accordingly, we find no error.

## D. Closing Argument

[26] Fourth, Belcher contends the prosecutor committed misconduct during closing argument by shifting the burden of proof to the defense and by making inflammatory remarks. In support of this contention, Belcher points to the following portion of the State's closing argument:

In order to find the Defendant not guilty, you have to believe everything the mother tells you and, somehow, you also have to—in addition to believe what Mom tells you, that this Quinn James decided to set his friend up in that ten (10) minutes, that he somehow showed up at that house with all of this stuff, three (3) different scales, cocaine, marijuana in three (3) different packages, pills, and he went around planting it all over the house. It's almost as if that child in that example I gave you this morning with—or yesterday morning with the cookies, it's almost like her explanation for the missing cookie was not the U.P.S. man, but the Cookie Monster, the Cookie Monster did it. Well, that's not reasonable and neither is the defense. The Defendant is guilty.

Tr. at 325.

[27]   Belcher argues the prosecutor shifted the burden of proof by stating the jury must believe Sabrina's testimony as well as believe James planted the drugs and scales in the house in order to find Belcher not guilty. It is improper for a prosecutor to suggest a defendant shoulders the burden of proof in a criminal case. *Stephenson v. State*, 742 N.E.2d 463, 483 (Ind. 2001), *cert. denied*, 534 U.S. 1105 (2002). But to the extent the prosecutor's statements in this case were improper, the error was cured by the trial court instructing the jury that the defendant is not required to prove his innocence or present any evidence at trial. *Ramsey v. State*, 853 N.E.2d 491, 501-02 (Ind. Ct. App. 2006), *trans. denied*; Appellant's Appendix at 67-68. We find no fundamental error.

[28]   As to the alleged "inflammatory remarks," Belcher argues the prosecutor's references to the Cookie Monster were "disrespectful to defense counsel as well as the court" and "can only be seen as inflammatory." Appellant's Br. at 19.

Our review of the record indicates the prosecutor was referring to an analogy she used to explain reasonable doubt during voir dire. The prosecutor introduced a scenario in which a child had been told he was not allowed to eat freshly baked cookies. In the first variation, a cookie goes missing, the child denies eating the cookie, but the child has chocolate and crumbs on his face. In the second variation, a cookie goes missing, the child denies eating the cookie, but the child does not have chocolate or crumbs on his face. In the final variation, a cookie goes missing, the child denies eating the cookie, but the child explains he offered the cookie to a delivery person who stopped by the house to deliver a package. "And you look around and, sure enough, now there's a package in your kitchen," the prosecutor explained. Tr. at 52.

[29] Clearly, when referencing the Cookie Monster, the prosecutor was making an argument about reasonable doubt, using the analogy she employed during voir dire. Since we fail to understand how this *Sesame Street* reference could be construed as inflammatory, we find no error, let alone fundamental error. *Compare Brummett v. State*, 10 N.E.3d 78, 87 (Ind. Ct. App. 2014) (holding the prosecutor committed misconduct by asking a defendant charged with child molesting whether he enjoyed touching both of his victims' vaginas or "was there only one you like[d] better" because the questions were "argumentative and inflammatory") (alteration in original), *summarily aff'd*, 24 N.E.3d 965 (Ind. 2015).

## E. Cumulative Error

[30] Finally, Belcher argues the alleged misconduct, viewed cumulatively, resulted in fundamental error. Belcher likens his case to *Brummett*, 10 N.E.3d 78. In *Brummett*, this court held a prosecutor's misconduct cumulatively amounted to fundamental error because all of the instances of misconduct went straight to witness credibility, and the case "hinge[d] largely on the credibility of witnesses." *Id.* at 88 (finding the prosecutor improperly distinguished the roles of the prosecution and defense, vouched for the credibility of the witnesses and justness of the cause, and asked inflammatory questions). Belcher argues he was denied a fair trial because much of the alleged misconduct went to the credibility of his mother, the main witness for the defense. But given the fact the police found Belcher's personal items in close proximity to the marijuana and the AR-15 rifle, we do not agree this case hinged on the credibility of witnesses, and we are furthermore not persuaded the alleged misconduct in this case cumulatively constituted fundamental error. In short, Belcher was not denied a fair trial for any of the reasons asserted, individually or cumulatively.

# Conclusion

[31] The State presented sufficient evidence to support Belcher's convictions for unlawful possession of a firearm by a serious violent felon and possession of marijuana, and the prosecutor did not engage in misconduct amounting to fundamental error. We therefore affirm Belcher's convictions.

[32] Affirmed.

Vaidik, C.J., and Pyle, J., concur.